The Nation Oil Company, et al., Plaintiffs-Appellees, v. R. C. Davoust Company, Inc., an Illinois Corporation, Lester Armour, et al., Defendants-Appellants.

Yabrove Petroleum Company, Milo Oil Company, John A. Redding, Trustee for Continental Illinois National Bank and Trust Company, Fred C. Newman, Trustee for Old National Bank in Evansville, Sohio Petroleum Company, a Corporation, Ashland Oil & Refining Company, a Corporation, The Ohio Oil Company, a Corporation, and The Pure Oil Company, a Corporation, Defendants-Appellees.

R. C. Davoust Company, Inc., an Illinois Corporation, Lester Armour, et al., Counterplaintiffs-Appellants, v. The Nation Oil Company, an Illinois Corporation, Nation Drilling Company, an Illinois Corporation, and Ben H. Nation, Counterdefendants-Appellees.

Gen. No. 64–53.

Fifth District.

August 28, 1964.

226

Chapin & Chapin, of Springfield (Charles A. Chapin, of counsel), for defendants-appellants and counterplaintiffs-appellants.

Craig & Craig, of Mt. Vernon (Howard W. Campbell, of counsel), for plaintiffs-appellees and counter-defendants-appellees.

REYNOLDS, J.

Suit was commenced by The Nation Oil Company, Nation Drilling Company, and Ben H. Nation, against R. C. Davoust Company, Inc., an Illinois corporation and nine individual defendants, for the sum of $9,004.24 for services and expenses for operating and managing during the term of changeover, oil wells and leasehold estates sold to the defendants by the plaintiffs. Another count of the complaint was for the sum of $24,149.87 for oil in the tanks of the various oil properties as of January 1, 1961, which was the transfer date of the various oil properties. Various oil companies were also made defendants as purchasers of the oil.

The defendants, R. C. Davoust Company, Inc. and the nine individual defendants, answered denying owing the plaintiffs for services rendered and for the oil in the tanks as of January 1st, 1961, counterclaimed for $11,722.09 for oil runs made by plaintiffs-counterdefendants, to Ohio Oil Company; for damages by reason of bond expense in the amount of $2,317.32; and for the court to order plaintiffs-counterdefendants to execute certain transfer orders in order to complete the transaction. Count II of the counterclaim asked that the plaintiffs-counterdefendants be required to account to the defendants-counterplaintiffs, for oil produced by two wells, the No. 5–B well on the Blakely lease and the No. 2 well on the W. P. McIntosh lease, and cease producing and pumping from these two wells about the base of the McClosky lime, claiming the agreement of January 1, 1961, reserved to the sellers only oil produced below the base of the McClosky lime. Count III of the counterclaim claimed three pumping unit substructures each valued at $750

228

claiming these substructures were included in the transfer agreement effective January 1, 1961. Count IV of the counterclaim was for a stock tank and engine of the value of $1,000 claimed to be included in the transfer agreement.

There are plaintiffs, defendants, plaintiffs-appellees, defendants-appellees, defendants-appellants, counterplaintiffs-appellants and counterdefendants-appellees. For the purpose of this opinion, The Nation Oil Company, Nation Drilling Company and Ben H. Nation will be called "Nation" and R. C. Davoust Company, Inc., and the nine other individual defendants will be called "Davoust." The defendants-appellees, are the purchasers of the oil involved in this case. Treating the sellers as "Nation" and as one group, and the buyers as "Davoust" and as one group, designating the parties as plaintiffs or defendants, appellants or appellees, counterplaintiffs or counterdefendants will not be necessary.

This case involved the sale of operating interests in some 90 oil producing leases in Southern Illinois by Nation to Davoust for a sum of $1,200,000, the original terms of sale being set out in detail by memorandum of agreement signed by Nation and Davoust on August 30, 1960, effective as of July 1, 1960. Under this agreement, the closing date was set for October 1, 1960. For various reasons, the sale was not consummated in accordance with the terms of the agreement of August 30, 1960, and a new memorandum of agreement was entered into by Nation and Davoust dated January 4, 1961. The old agreement was cancelled by both Nation and Davoust, by endorsement on the old agreement these words: "This contract cancelled by mutual consent, and is of no further force or effect," and by their signatures.

After the signing of the new memorandum of agreement dated January 4, 1961, but effective as of January 1, 1961, certain disagreements arose between the

parties. Nation was to operate the wells for Davoust until actual take-over. Nation claimed its expenses and charges for this operation which was not paid by Davoust, Davoust claiming that it was entitled to the proceeds of the oil in the tanks, as of January 1st, 1961; that Nation was pumping oil from two wells above the McClosky lime in violation of the agreement, and that Nation had withheld certain pumping unit substructures of the value of $2250, and had withheld a stock tank and engine of the value of $1000. In addition Davoust claimed out-of-pocket expenses in connection of necessary bond expenses because of Nation's refusal to sign oil transfers.

The matter was tried before the court without a jury and the trial court gave Nation judgment for $23,534.50 for the oil on hand and in tanks January 1st, 1961, plus some other small amounts; construed the reservation clauses as to the two wells so as to allow Nation to produce oil from these two wells above the McClosky lime; denied Davoust's claim for $11,722.09 for oil runs held in suspense and not taken in account in the price adjustment, and denied Davoust's claim for $5,411.39 damages for Nation's refusal to sign transfer orders for oil. Davoust appeals from these portions of the decree. The trial court gave judgment to Davoust for $1,194.21, the value of the pumping unit substructures which the court held were covered by the agreement. Nation appeals this portion of the decree.

This appeal raises a number of points, but reduced to their simplest terms, can be designated as follows: —(1) The Blakely and McIntosh well issue; (2) Oil in tanks issue; (3) Suspended Runs issue; (4) Transfer Order issue; and (5) Substructures issue.

In order to resolve these issues, it will be necessary to examine and construe the agreement of January 4, 1961, which spells out the various matters in detail. Both Nation and Davoust were represented by their

lawyers at all times during the negotiations and drawing up of the July 1, 1960 agreement and the January 1, 1961 agreement. This court will assume that each party had agreed to the terms of the January 1, 1961 agreement and had cancelled the agreement of July 1, 1960. The language in the January 1, 1961 agreement and the assignment and conveyance dated January 23, 1961, must govern.

The reservations in the sale agreement relative to No. 5 well on the Blakely B lease, and No. 2 well on the W. P. McIntosh lease, were in the following language:

> "The Grantors reserve, in proportion to their respective interests, and except from this assignment, the following:
>
> "1. As to that part of the Blakely 'B' lease described as the Southwest Quarter of the Northeast Quarter of Section 27, Township 1 South, Range 8 East, in Wayne County, Illinois (being part of Lease No. 6 on Part 5 of Exhibit 'A' hereto), all their leasehold rights as to formations below the base of the McClosky lime, together with Well No. 5–B thereon and the equipment of such well except the tank battery.
>
> "2. As to the W. P. McIntosh lease in White County, Illinois (being Lease No. 9 on Part 6 of Exhibit 'A' hereto), all their leasehold rights as to formations below the base of the McClosky lime, together with the No. 2 Well thereon and the flow line, pumping unit, and other equipment on or in such well."

It seems to be a practice in the oil industry that ownership may be held in horizontal divisions, that is, one owner may own all the oil or the right to pump oil from a horizontal division such as below the McClosky lime; another may be above or below the St.

231

Louis or the Aux Vases formation. Apparently, these are definite formations in the earth's stratum, and these formations occur in an orderly formation. The McClosky lime formation is below the Aux Vases formation. Thus it is possible to drill through the Aux Vases formation and pump oil from another formation below. That seems to be the situation here. Davoust contends that Nation was restricted to pumping oil from the two wells in question to below the McClosky lime. That by reason of the terms of the agreement, could not pump oil from the Aux Vases formation, which lies above the McClosky lime. Both wells had been drilled to depths below the McClosky lime, and at the time of the negotiations for sale, the McIntosh well was producing from a formation below the McClosky lime and the Blakely well was producing from a formation above the McClosky lime. Davoust claims that the only right reserved to Nation was the well itself, with the right to produce oil from such well only from formations below the McClosky lime. Nation contends that the reservation included that part of the leases below the McClosky lime together with the right to produce from the two wells at any depth.

██ ██ In construing this portion of the agreement, this court is confined to an interpretation of the bare words of the agreement itself. While both parties cite Illinois cases which are the general law, there does not appear to be any trade usage or custom of the oil industry that will assist the court in arriving at a decision. The dictionary definitions are cited as to the words "well," "together" and "together with." Both parties cite The Oxford Universal Dictionary, Third Addition, 1955, as to "together with" as meaning "in addition to." If this definition is correct, the language of the agreement meant that all rights of Nation to that part of the Blakely and McIntosh leases below the McClosky lime were reserved and

232

in addition the wells themselves were also reserved. Davoust insists that a well is only a hole in the ground drilled to obtain oil. Nation contends the word "well" includes more than just the hole in the ground. We are inclined to agree with the latter view. The word "well," as used in the agreement between the parties here, meant not only the hole in the ground, but the casing and all the equipment that made it an oil well, above and below ground. By implication it included the right to operate the well.

Davoust urges that a reservation in a conveyance should be strictly construed against the grantor. Wise v. Wouters, 288 Ill 29, 33, 123 NE 35. Unfortunately for this contention, it appears that Mr. Joe Vol Butt, attorney for Davoust, drafted the original agreement of July 1, 1960, and that Mr. Marshall, attorney for Nation, merely copied the reservations made in the first agreement into the agreement of January 1, 1961.

■■ The language of the reservations is plain and unequivocal. Mr. Marshall testified it was intended to reserve the whole well, and all the formations below the McClosky lime. He stated he considered the language used sufficient to reserve the entire oil well and the equipment in it. That is entirely different than considering the well only a hole in the ground. This court agrees with the finding of the trial court on that issue.

■■ The second issue is the question of ownership of oil in the tanks as of January 1, 1961. The language of the sale agreement effective January 1, 1961, conveyed all the working interests of Nation, with the exceptions hereinafter noted, in and to the oil and gas leases and the *personal property* and leasehold equipment therein described in Exhibit "A" hereto attached and made a part hereof, said Exhibit "A" consisting of six parts respectively designated Part 1 to Part 6, inclusive. The language of the conveyance by Nation on January 23, 1961, conveyed Nation's in-

233

terest to Davoust, of the working interests as described in Exhibit "A," hereto attached, in the oil and gas leases covering lands in certain counties in Illinois, being the interests described in Exhibit "A," together with an interest in the wells and all *personal property, fixtures, and equipment located on each lease or in connection therewith* that corresponds to the leasehold interest herein conveyed. (The emphasis is ours.) The oil in tanks does not appear listed in the six page Exhibit "A" attached to the conveyance document. Unquestionably, oil pumped out of the ground and stored in tanks is personal property. But does the mere fact that it can be classed as personal property make the language used in this conveyance such as to include this oil in tanks? The conveyance included "all personal property, fixtures and equipment located on each lease or used in connection therewith." If the doctrine of ejusdem generis is applied, the personal property would be of the same class as fixtures, and equipment located on each lease or used in connection therewith. While here the words "personal property" in this instance precede the words "fixtures" and "equipment," while in the ejusdem generis doctrine the general words follow the particular words, the principle would be the same. However, here all three words are rather general so that the doctrine of ejusdem generis is not particularly applicable. However, there are words of limitation, when the whole wording is considered. When you consider that it was intended to convey "all personal property, fixtures, and equipment located on each lease, or used in connection therewith," the words fixtures and equipment would have some limitation on the words "personal property." The extent of the coverage by the words "personal property" is not an exercise in semantics, and this court will not attempt to interpret them here simply on the basis of what the words include. Rather, we will attempt to interpret them on

234

the basis of what the parties intended, the custom of the trade, and in the light of such acts or omissions on the part of those involved that will throw light on the matter. Both parties hereto were experienced in the oil business. Each had attorneys well versed in the oil business laws and procedures. A sale agreement and subsequently an instrument of conveyance were drawn up and signed by the parties. There does not seem to be any disagreement or lack of agreement up to the signing of the instrument of conveyance on January 23, 1961. When the agreement of January 1, 1961 was drawn up, Mr. Marshall, who drew it on the instructions of Mr. Butt, attorney for Davoust, and his client, testified the intention was that ownership of the oil in the tanks as of the effective date of sale, would remain in the seller. Mr. Marshall had handled a number of oil well sales transactions and testified further that where a specific date for closing a transaction was set, it was the custom in the oil business that the ownership of the oil in tanks prior to the date of closing remained the property of the seller. The witness stated this custom to his knowledge, was followed in the oil industry. This witness further testified that such language was standard for transfer of oil interests. Since all parties concerned were familiar with the oil industry, it would seem that the ordinary and customary usage of the trade should have considerable weight in showing the intention of the parties. Another factor to consider is that the list of articles of personal property in Exhibit "A" did not include the oil in tanks. Likewise, when Davoust mortgaged the properties to a Chicago bank, the mortgage covered "The oil, gas and mineral leases, lands and royalties, and other property described in Exhibit 'A' hereto attached and made a part hereof." And the mortgage also included all the oil, gas and other minerals produced from the lands described in Exhibit "A." And also included was all surface or subsurface machinery,

235

equipment located on the lands, useful for production, treatment, storage or transportation of oil or gas. But nowhere is there any listing of the oil in tanks. There are a number of authorities on the subject of Oil and Gas. While these authorities in the main are treatises on the law governing oil and gas all over the United States, in the lack of express authority on the subject in Illinois they are entitled to considerable weight as stating the law generally. In Summers Oil and Gas, Permanent Edition, Vol 3, Sec 555, page 663, it is stated:

> "Although an assignment of a lease does contain language expressive of an intention to pass title to machinery and equipment, oil stored on the premises in tanks, or oil which has been run from a lease into a pipeline prior to the date of the assignment, does not pass to the assignee."

In Thornton Oil and Gas, Willis, Fifth Edition, Vol 2, Sec 401, page 697, it is said:

> "A sale of a lease does not carry the oil pumped out and in the tank on the premises."

It is conceded, that a custom or usage, is subject to the parol evidence rule that parol evidence cannot be shown to vary the meaning of a written instrument. It is also true, that parties to a contract may express intent contrary to a custom of the trade, and that a custom may not vary express terms of a contract. Ambarann Corp. v. Old Ben Coal Corp., 395 Ill 154, 165, 69 NE2d 835. Where unambiguous language, which has a settled legal meaning, is used in a contract or deed, evidence, whether of custom or otherwise, is inadmissible to vary or contradict the words employed. Here, the words used, "personal property" were not so unambiguous as to prevent or make inadmissible the testimony of custom in the trade and subsequent acts of the buyer in connection

236

with the property purchased. The language used was general and the fact that this issue is presented in this suit, proves conclusively that it has different meaning to men experienced in the oil business. The evidence admitted was not to vary the terms of the written instrument, but to interpret and define them. The State of Illinois is one of the great oil producing States of this country. However, we find no Illinois authority on the question here. The decision of this court must therefore be based upon ordinary understanding of the language used, the custom of the trade, the acts or omissions of the parties before and after the execution of the sale agreement or transfer, and basing this court's judgment on those factors, this court must hold that the finding of the trial court that this oil in tanks was the property of Nation and did not pass to Davoust by the instrument of assignment, was correct.

 The issue of suspended oil runs is based upon an alleged oral agreement that sellers account to buyer for some $11,722.09 owed by the Ohio Oil Company for oil produced by the Nation wells during the months of July through November 1960. This was denied by Nation. The trial court held that this agreement was not proved and disallowed Davoust's claim. Since this was a question of fact, decided by the court without a jury, this court will not attempt to review the judgment of the trial court. Where the court hears the testimony of witnesses, and there is a conflict in the evidence, the decision of the court on a question of fact will not be disturbed by the reviewing court unless clearly and palpably against the weight of the evidence. Cline v. Cline, 12 Ill App2d 231, 139 NE2d 828; People ex rel. White v. Underwood, 1 Ill2d 620, 116 NE2d 354; Compton v. School Directors of Dist. No. 14, Whiteside County, 8 Ill App2d 243, 131 NE2d 544; Mirski v. Chesapeake & O. Ry. Co., 44 Ill App2d 48, 194 NE2d 361.

The refusal of Nation to sign transfer orders is claimed to have caused Davoust to expend several thousand dollars in bonds and other expenses and this is claimed by Davoust as damages. The refusal of Nation to sign such transfer orders is conceded, but Nation contends that Davoust had breached the contract by refusing to pay him for the costs of operating the wells during the period from January 1, 1961 to the date of actual transfer of the operation to Davoust, the latter part of January.

The parties to a valid contract are bound to perform it according to its terms or else respond in damages. One cannot have all the benefits of a contract without taking therewith the obligations imposed by that contract. 12 Ill Law and Practice, Sec 361, page 508.

Where the undertakings of the parties to a contract are mutual and dependent, a party seeking to recover for breach of contract must show that he has performed or offered to perform his own obligations under the contract or that such performance on his part was excused. 12 Ill Law and Practice, Sec 363, page 509.

Under the circumstances in this cause, this court sees no merit in the claim of Davoust for damages caused by the failure of Nation to sign transfer orders.

As to the question of the ownership of the pumping unit substructures on the Delahunt lease, Davoust claimed them under the assignment of January 23, 1961, because they were on a lease that was included in the assignment. It is not contended they were part of any well or used in any well. Lewis F. Russell, who worked with Nation and after the assignment, with Davoust, testified that they were only stored by Nation on the Delahunt lease. He testified that Na-

tion had bought them a year or so before the assignment. They were never put in the equipment yard at Fairfield, Illinois. That the wells on the Delahunt lease were operating wells and the substructures were not used in connection with the Delahunt wells or lease, or any other lease. That they were stored on the Delahunt lease as equipment.

Ben Nation testified he bought six substructures for $5,800 and sold two of them and stored the other four on the Delahunt land. That he obtained the permission from the farmer to store them on the Delahunt land. Ben Nation further testified the substructures were not intended for use on the Delahunt lease wells, were not used at anytime on the Delahunt lease or any other lease and belonged to him personally. That he never intended to include them in the assignment to Davoust, and they were not included in the assignment; that all the equipment that was not in use on the leases was included in an inventory and that these substructures were not included in the inventory.

The evidence of ownership of these substructures on the part of Davoust is far from satisfactory. The mere fact they were on the Delahunt lease land is not sufficient. The evidence is that they were never used on the Delahunt lease or any other lease. They were stored with the permission of the landowner, which would not have been necessary if they were used or part of the drilling operation. Under the circumstances and the evidence as produced on this point, this court must hold that Davoust has failed to prove ownership and that the substructures were and remained the property of Nation.

The judgment of the Circuit Court will be affirmed in all respects except as to the ownership of the pumping unit substructures and as to that ownership this

239

court holds that the ownership of the pumping unit substructures was and remained in Nation and that part of the trial court's judgment is reversed.

Affirmed in part and reversed in part.

DOVE, P. J. and WRIGHT, J., concur.