In re Henry Robert **FULLOP**, Debtor.

Gibson D. **KARNES**, Trustee, Plaintiff,

v.

**SALEM NATIONAL BANK**, Defendant.

Bankruptcy No. BK 85–40388.
Adv. No. 88–0074.

United States Bankruptcy Court,
S.D. Illinois.

Sept. 14, 1990.

Charles E. Jones, McLeansboro, Ill., Terry Sharp, Mt. Vernon, Ill., for Trustee.

A. Ben Mitchell, Mount Vernon, Ill., for Salem Nat. Bank.

Roger L. Vetter, Belleville, Ill., for Ralph Stowe and Tristram Resources, Inc., Intervenor.

## MEMORANDUM AND ORDER

KENNETH J. MEYERS, Bankruptcy Judge.

The Court is called upon in this case to determine the effect of the Uniform Commercial Code on a creditor's security interest in oil and gas properties. Specifically, the Court must decide whether assignments of the debtor's working interests in oil and gas leases given as security for loans to the debtor were required to be perfected as security interests under the Uniform Commercial Code and, if so, whether recording of the assignments in the real estate records of the county where the wells were located gave the creditor a perfected security interest in oil produced from the leases as well as in accounts resulting from sale of the oil and in equipment used on the lease properties.

From 1979 to 1981, the debtor, Henry Fullop, executed assignments of fractional working interests in certain oil and gas leases to Salem National Bank ("Bank") to serve as collateral for loans made to the debtor. The Bank recorded these assignments in the county real estate records and subsequently received payments of the oil runs attributable to the assigned working interests through transfer and division orders executed with the pipeline company at the debtor's direction.

On September 30, 1985, the debtor filed a Chapter 11 bankruptcy proceeding, which was converted to a proceeding under Chapter 7 in January 1989. In March 1988, while the Chapter 11 case was pending, Fullop, as debtor-in-possession, commenced an adversary proceeding to avoid the Bank's security interest in oil and gas collateral assigned to the Bank by the debtor. The complaint alleged that the Bank failed to properly perfect its security interest in the assigned oil interests under the Uniform Commercial Code and that the trustee, as hypothetical lien creditor under 11 U.S.C. § 544(a), was entitled to recover payments from the oil runs that had been made to the Bank since the filing of the debtor's bankruptcy petition.[1]

The relevant facts, stipulated to by the parties, concern documentation of the transactions between the debtor and the Bank. On February 1, 1985, the debtor

---

1. The Chapter 7 trustee was substituted as plaintiff in the adversary proceeding following conversion of the case to a proceeding under that chapter.

executed two promissory notes in the amount of $207,194.59 and $488,098.33, which were renewals of prior notes. Both notes contained language granting the Bank a security interest in property assigned to the Bank by the debtor and specifically made reference to security agreements executed by the debtor on September 30, 1982, and December 29, 1982. The notes further granted a security interest in "assignments of various oil and gas leases now owned or hereafter acquired in the possession of the Bank."

The security agreements referenced in the notes each grant a security interest in "assignments of the following oil and gas leases," listing numerous oil leases by name and lease number. To give effect to the security agreements, the debtor executed and delivered to the Bank a series of assignments of working interests owned by him in varying amounts in the named oil and gas leases. Transfer and division orders were executed with the pipeline companies that purchased oil from the particular leaseholds, directing the payment of

proceeds attributable to the debtor's interest to the Bank for the debtor's account.[2]

The Bank recorded the assignments of the debtor's interests in the various leases in the recorder's office of the county where the leases were located. On December 27, 1979, the Bank filed a UCC–1 financing statement in the office of the Secretary of State of Illinois, which listed machinery and equipment used in oil and gas production, and filed a UCC–3 continuation statement on December 17, 1984. The Bank made no other filings in the Secretary of State's office.

Oil produced from the leases covered in the assignments was purchased at the wellhead by the respective pipeline companies, and proceeds attributable to the debtor's interests were paid directly to the Bank pursuant to the transfer and division orders executed with the pipeline companies. Prior to the debtor's bankruptcy, the Bank applied these funds to the debtor's notes and remitted any balance to the debtor. Subsequent to the bankruptcy filing, the Bank paid the proportionate share of operating expenses of the assigned interests

---

2. The assignment and transfer orders for the Etienne Community # 1 leases in White County, Illinois, are typical of these transactions. In relevant part, the assignment states:

> KNOW ALL MEN BY THESE PRESENTS: That the undersigned, Henry Fullop, of Carmi, Illinois 62821, hereinafter called Assignor, for and in consideration of Ten and no/100 dollars ($10.00) and other valuable consideration, ... does hereby sell, assign, transfer and set over unto SALEM NATIONAL BANK for Account of Henry Fullop, hereinafter called Assignee, a ⅛th working interest in and to the following described oil and gas leases, covering lands situated in White County, Illinois, towit:
> 1. Oil & Gas Lease dated April 10, 1980, from Burnedine Etienne and Richard Etienne, her husband ..., Lessors, to Henry Fullop, Lessee, recorded in Book 145, Pages 493–495 of the records of the White County Recorder; and
>
> . . . . .
>
> INSOFAR as the above leases cover the following described land;
> The Southeast Quarter of the Northwest Quarter (SE ¼ NW ¼) of Section Twenty (20), Township Three (3) South, Range Eight (8) East, containing forty (40) acres, more or less;
>
> . . . . .
>
> together with the rights incident thereto and the personal property thereon, appurtenant

thereto, or used or obtained in connection therewith.

> . . . . . .
>
> This Assignment shall be effective as of September 1, 1981.
> EXECUTED this 30th day of September, 1981.
>                s/Henry Fullop

The transfer order to Rock Island Refining Corporation, dated December 8, 1981, showed Henry Fullop as "transferor" and stated:

> We, the undersigned, hereby certify and warrant that we have transferred, as indicated below, oil production from the ETIENNE COMM. # 1 located in the County of White, State of Illinois described as follows:
> SE ¼ NW ¼ Section 20–3S–8E, White County, Illinois
> Effective September 1, 1981, and until further written notice from either party, Rock Island is authorized to purchase, ... the oil produced from the above lease and to make payments therefor as follows:
> To whom transferred:
>    Salem National Bank A/C Henry Fullop
> Division of Interest:
>    .09570313 [Working Interest]

and applied the balance to the debtor's obligations under the notes.

The trustee's complaint to avoid liens under § 544(a) seeks to recover the amounts paid to the Bank from the debtor's oil runs since the debtor filed his bankruptcy petition. The trustee concedes that the Bank has a valid and perfected lien on the debtor's leasehold interests prior to production to the extent that such leasehold interests constitute real property subject to real estate recording statutes. The trustee argues, however, that once oil is brought to the surface and extracted from the real estate through normal production methods, it becomes personal property subject to the perfection requirements of Article 9 of the Uniform Commercial Code ("UCC") (Ill.Rev.Stat. ch. 26, ¶ 9–101 *et seq*). The trustee asserts that the Bank failed to comply with the UCC and so is unperfected as to its alleged security interest in oil and gas following production and placement in holding tanks, accounts arising from sale of the oil, and machinery and equipment placed on the leases and used in the production of oil and gas.

In response to the trustee's complaint, the Bank asserts that, under Illinois law, rights to oil production are derived from an owner's interest in the oil and gas leasehold, a real property interest to which the UCC has no application. The Bank contends that although extracted oil and gas is classified as personal property in Illinois, it retains its character as real estate for title purposes so that a security interest in such production is perfected by recording under the real estate statutes. The Bank argues, in the alternative, that if the UCC is applicable to the security transactions here, its recording of the debtor's assignments of working interest was sufficient to comply with UCC provisions relating to perfection of interests in extracted oil and gas.

### Application of the UCC

The present version of Article 9 of the UCC has been in effect in Illinois and other jurisdictions since 1972, yet there is little case law concerning its application to security interests in oil and gas collateral.

Given the hybrid character of oil and gas interests involving both real and personal property, the law that has developed is understandably ambivalent. The UCC, while disclaiming any effect on security interests in real property, expressly governs perfection of security interests in tangible and intangible personalty. Its provisions, therefore, must be confronted to the extent oil and gas collateral constitutes personal property.

As a general rule in Illinois, oil and gas in place constitutes land or real estate and belongs to the owner of the land so long as it remains under the land. *Miller v. Ridgley,* 2 Ill.2d 223, 117 N.E.2d 759 (1954); *see* 26 I.L.P. *Mining, Oil, and Gas,* § 12 (1956). An Illinois oil and gas lease, while not granting title to the oil itself, grants to the lessee the right to enter upon the surface of the land and to reduce the oil and gas to the lessee's possession. *Ohio Oil Co. v. Daughetee,* 240 Ill. 361, 88 N.E. 818 (1909). Because such a lease concerns the right to oil prior to extraction, Illinois courts classify an oil and gas leasehold as a freehold or real estate interest subject to real estate law. *In re Hanson Oil Co., Inc.,* 97 B.R. 468 (Bankr.S.D.Ill.1989).

Once oil reaches the surface and is reduced to possession, it is considered personalty and its sale and disposition is governed by personal property law. *Palumbo v. Harry M. Quinn, Inc.,* 323 Ill.App. 404, 55 N.E.2d 825 (1944); *see Nation Oil Co. v. R.C. Davoust Co.,* 51 Ill.App.2d 225, 201 N.E.2d 260 (1964): oil pumped out of the ground and stored in tanks is personal property. Thus, while an oil and gas lease itself conveys a real property interest, transactions concerning oil after extraction involve personal property interests subject to rules of personal property law.

Section 9–104(j) excludes from application of Article 9 "the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder[.]" Ill.Rev.Stat. ch. 26, ¶ 9–104(j). Under this provision, oil and gas leasehold transactions are excluded from coverage under Article 9 to the extent they involve oil in place prior to extraction. The definition of

"goods" to which Article 9 applies emphasizes this point. Section 9–105(1)(h) states that "goods" includes "all things which are movable at the time the security interest attaches …, but does not include … minerals or the like (including oil and gas) *before extraction.*" Ill.Rev.Stat. ch. 26 ¶ 9–105(1)(h) (emphasis added). The Illinois Code Comment to § 9–105(1)(h) notes that the exclusion of pre-severance minerals from the definition of "goods" is significant only in states that regard minerals as personalty before severance, whereas, in Illinois, minerals before extraction are deemed to be real property to which Article 9 does not apply. Ill.Ann.Stat. ch. 26, ¶ 9–105(1)(h) (Smith–Hurd 1974), at 61.[3]

By negative implication, § 9–105(1)(h) indicates that minerals following extraction which constitute personal property under state law come within the definition of "goods" to which Article 9 is applicable. *See MBank Abilene v. Westwood Energy, Inc.,* 723 S.W.2d 246 (Tex.Ct.App.1986); B. Clark, *The Law of Secured Transactions Under the UCC,* ¶ 13–03[1], at 13–8 (2d ed. 1988) (hereafter Clark, *Secured Transactions*). In one of the few decisions addressing the applicability of the UCC to oil and gas interests, the Kansas Supreme Court in *Ingram v. Ingram,* 214 Kan. 415, 521 P.2d 254 (1974), noted that the UCC seems "clearly intended to keep under the real estate recording laws any type of security interest relating to *unextracted* oil and gas." 521 P.2d at 260 (emphasis in original). The court stated:

> The oil and gas situation presents an unusual problem. Oil and gas are considered to be a part of the real estate until they are extracted; then they immediately change from realty to personalty. *It is upon extraction that the law pertaining to security interests in personal property comes into play.*

*Id.* (emphasis added). Because the leasehold interest in *Ingram* involved oil in place prior to extraction, the court found that assignment of the leasehold for security purposes was not subject to the UCC. No issue was raised in *Ingram* concerning priority of security interests in oil following extraction.

The court's observation in *Ingram* that the UCC becomes applicable to security interests in oil upon extraction finds support among UCC scholars who have considered the issue. In his treatise on secured transactions under the UCC, Professor Barkley Clark discusses the various types of oil interests that may be used as collateral, e.g., royalty interests, oil and gas leasehold or working interests, overriding royalty interests, production payments, and net profits interests. While noting that the law of real estate mortgages should govern security in minerals prior to extraction, the author states: "It is clear that the oil and gas mortgage intersects with Article 9 insofar as it seeks to pursue the minerals and their proceeds after extraction, when they become personal property." Clark, *Secured Transactions,* ¶ 13.01, at 13–3. Thus,

> [e]ven though interests in unextracted minerals are generally excluded from Article 9, the typical oil and gas mortgage chases the minerals out of the ground and extends to the proceeds of sale at the wellhead; these proceeds are known in the industry as "the runs." The oil and gas financer will also seek to include the equipment on the site as part of the total package. With respect to these personal property elements of the mortgage, Article 9 applies with a vengeance.

---

**3.** The 1972 amendments to Article 9 evidence a like intent to exclude minerals prior to extraction from coverage. A reference in the 1962 version of § 9–203(1)(b) concerning the requirements for attachment of a security interest in "oil, gas or minerals to be extracted" was deleted in the 1972 version "because revised Article 9 does not recognize a security interest in [such collateral] until it has been extracted from the land." Illinois Code Comment, Ill.Ann.Stat. ch. 26, ¶ 9–203(1) at 107. Similarly, the 1972 version of § 9–204 governing after-acquired property and future advances eliminated a provision of the 1962 Code that a debtor "has no rights … in oil, gas or minerals until they are extracted[.]" Here, again, the reason for the change was that this provision was "unnecessary and possibly confusing" and raised issues concerning the classification of minerals that were best left to the courts. *See* Official Reasons for 1972 Change, 3 Uniform Commercial Code (U.L.A.), § 9–204, at 280 (1981).

*Id.,* ¶ 13.02[5], at 13–7 to 13–8. *See also* 3 R. Nimmer, *Commercial Asset–Based Financing,* §§ 23:07, 23:11–14 (1988) (hereafter Nimmer, *Asset–Based Financing*).

The UCC makes express reference to oil and gas following extraction as collateral subject to Article 9 perfection requirements. Subsection (5) of § 9–103, governing the perfection of security interests in multiple state transactions, is entitled "Minerals" and provides as follows:

> Perfection and the effect of perfection or non-perfection of a security interest which is created by a debtor who has an interest in minerals or the like (including oil and gas) before extraction *and which attaches thereto as extracted,* or which attaches to an account resulting from the sale thereof at the wellhead ... are governed by the law ... of the jurisdiction wherein the wellhead ... is located.

Ill.Rev.Stat. ch. 26, ¶ 9–103(5) (emphasis added).[4] Generally, a security interest in Article 9 collateral is perfected by the execution of a security agreement (Ill.Rev. Stat. ch. 26, ¶ 9–203(1)) and the filing of a financing statement (Ill.Rev.Stat. ch. 26, ¶ 9–302). Section 9–401(1)(b) designates where a financing statement covering oil and gas should be filed, and §§ 9–402(1) and (5) set forth the formal requisites for such a financing statement. Section 9–403(7) further states the duties of the filing officer in filing a financing statement covering minerals "including oil and gas." All of these provisions refer to "accounts un-der subsection (5) of Section 9–103(5)" and so make the filing requirements for accounts arising from sale at the wellhead the same as for the oil and gas as extracted.

■ The express reference in Article 9 to security interests in oil and gas upon extraction and the characterization of extracted oil and gas as personalty under state law lead this Court to find that Article 9 applies to security interests in oil and gas upon extraction and to accounts arising from sale of the oil and gas. While the Bank's rights in the present case arose out of the debtor's assignment of working or leasehold interests which are characterized as real estate under Illinois law, the parties contemplated that the Bank's security interest would continue in the oil and gas after production and in the rights to payment for its sale, which are personal property interests subject to perfection under the UCC.[5] It is not disputed that the debtor's assignments, although outright in their terms, were intended as security for loans made to the debtor. To the extent the assignments conveyed the debtor's interest in oil and gas produced from the leaseholds, they came within the broad scope of Article 9, which applies to "any transaction (regardless of its form) which is intended to create a security interest in personal property...." Ill.Rev.Stat. ch. 26, ¶ 9–102(1)(a). Accordingly, the Bank was required to comply with the requirements of the UCC in order to perfect its security

---

**4.** The Official Comment explains that § 9–103(5) was added by the 1972 amendments to deal with "problems relating to the financing of minerals (including oil and gas) as these products come from the ground."

> In some cases rights in oil and gas in the ground have been split into a large variety of interests. As the oil or gas issues from the ground, it may be encumbered by the group of persons having interests therein. Or the product may be sold at minehead or wellhead and the resulting accounts assigned.... To avoid the difficult problems of search thus created, subsection (5) provides that the place for filing with respect to security interests in the minerals as they issue from the ground ... shall be in the state where the minehead or wellhead is located. Section 9–401 similarly provides that the place to file within the state is in the real property records in the county where the minehead or wellhead is located.

Official Comment 8, 3 Uniform Commercial Code (U.L.A.), § 9–103, at 125–26.

**5.** The Bank argues that oil production attributable to the debtor's leasehold interest constituted "rents" belonging to the Bank as assignee of this real property interest. The nature of oil and gas as a depleting asset, however, makes the Bank's analogy to ordinary rents from real estate inapplicable. *See In re Hanson Oil Co.,* 97 B.R. at 470, *quoting Central Standard Insurance Co. v. Gardner,* 17 Ill.2d 220, 238, 161 N.E.2d 278 (1959). Once the oil has been extracted from the ground it cannot be replaced. Thus, it is more appropriate to characterize the extraction of oil and gas as a "change in form" of collateral securing the loan from real to personal property.

interest in personal property attributable to the working interests assigned to it by the debtor.

### Perfection Requirements Under the UCC

Article 9 makes special provision for security interests in minerals, including oil and gas, and accounts arising from sale of oil at the wellhead. *See* 8 Anderson, *Uniform Commercial Code*, § 9–103:30 (1985). Under the 1962 version of Article 9, it was necessary to file centrally to perfect a security interest in extracted minerals and accounts, just as in the case of ordinary "goods" and "accounts." In 1972, the filing requirements of § 9–401 were amended to allow for local filing in the case of certain "land-related" transactions, including interests in extracted minerals and accounts subject to § 9–103(5). Section 9–103(5) applies when the debtor has an interest in minerals before extraction which attaches to the minerals as they are extracted and to accounts arising from sale of the minerals at the wellhead.[6] As to this special category of "goods," § 9–401(1)(b) provides:

> (1) The proper place to file in order to perfect a security interest is as follows:
>
> (b) when the collateral is timber to be cut or is *minerals or the like (including oil and gas) or accounts subject to subsection (5) of Section 103,* or when ... the collateral is goods which are or are to become fixtures, then in *the office where a mortgage on the real estate would be filed or recorded[.]*

Ill.Rev.Stat, ch. 26, ¶ 9–401(1)(b) (emphasis added).

Under § 9–401(1)(b), filing as to oil and gas financed at the wellhead or the resulting accounts is to be made not merely in the office where real estate mortgages would be recorded but in the real estate records themselves.[7] It is intended that "these filings will be readily disclosed on any real estate search and they can be treated like any real estate encumbrance so disclosed." Official Reasons for 1972 Change, 3A Uniform Commercial Code (U.L.A.), § 9–401, at 10. *See also* Nimmer, *Asset–Based Financing*, §§ 23:12, 23:13.

Section 9–402, providing the formal requisites of financing statements, furthers the policy of ensuring that filings as to real estate-related collateral such as timber, minerals, and fixtures be made in the real estate records where a creditor would normally look for information on interests created by the debtor. Subsection (1) states the general requirements that a financing statement give the names and addresses of the debtor and secured party, be signed by the debtor, and contain a statement indicating the types, or describing the items, of collateral. Ill.Rev.Stat. ch. 26, ¶ 9–402(1). It further provides that when the financing statement covers timber, minerals subject to § 9–103(5) or fixtures, the statement must also comply with subsection (5) of 9–402, which requires that the financing statement "show that it covers this type of

---

**6.** In R. Anderson's treatise on the UCC, he observes that if the security interest does not attach to minerals as indicated in § 9–103(5),

> the mineral provisions of the Code do not apply. For example, if the debtor owned a stockpile of coal and created a security interest therein, the interest would be treated as an interest in ordinary goods, and if the debtor sold some of such coal and then had an account for the purchase price, such account would be governed by ordinary account principles when the debtor created a security interest.

8 Anderson, *Uniform Commercial Code*, § 9–103:30, at 504 (1985).

**7.** Section 9–403(7) makes clear that financing statements covering extracted minerals or accounts are to be indexed in the real estate search files rather than with other financing statements subject to local filing, such as those covering crops or farm equipment (§ 9–401(1)(a)). This section states that a financing statement covering minerals or accounts subject to § 9–103(5) shall be indexed under the names of the debtor and record owner

> in the same fashion as if they were the mortgagors in a mortgage of the real estate described, and, to the extent that the law ... provides for indexing of mortgages under the name of the mortgagee, under the name of the secured party as if he were the mortgagee thereunder, or where the indexing is by description in the same fashion as if the financing statement were a mortgage of the real estate described.

Ill.Rev.Stat. ch. 26, ¶ 9–403(7).

collateral, ... recite that it is to be filed in the real estate records, and ... contain a description of the real estate." Ill.Rev. Stat. ch. 26, ¶ 9–402(5). If the debtor does not have an interest of record in the real estate, the financing statement must show the name of a record owner so that the filing officer may index it in the real estate records to be discovered in an abstract search. Ill.Rev.Stat. ch. 26, ¶¶ 9–402(5), 9–403(7).

█ Under the 1972 revision of Article 9, the filing procedures for perfecting a security interest in oil production and proceeds of sale at the wellhead as personal property closely resemble those for recording a real estate interest in minerals in place prior to extraction. So long as the requisites of a UCC recording are met, the "notice" function of a financing statement may be met by filing a copy of the security documents covering extracted oil and accounts in the real estate records.[8] Ill.Rev. Stat. ch. 26, ¶ 402(1); *see* Clark, *Secured Transactions*, ¶ 13.03[1][b]; Nimmer, *Asset–Based Financing*, § 23:13. If the security includes equipment used in development of a lease, however, it is still necessary to file centrally in the Secretary of State's office, as the 1972 amendments do not include equipment in the oil and gas collateral that may be perfected by local filing. *See* Clark, *Secured Transactions*,

§ 13.04[1]. Thus, the lender wishing to perfect as to all components of an oil and gas security interest will file locally at the wellhead for the oil produced and accounts from its sale as well as with the Secretary of State for the leasehold equipment.[9] With regard to both filings, it will be necessary to file continuation statements every 5 years to maintain the effectiveness of the original filing. Ill.Rev.Stat. ch. 26, ¶ 9–403(1); *cf.* Ill.Rev.Stat. ch. 26, ¶ 9–403(6): a real estate mortgage filed as a *fixture* filing under § 9–402(6) remains effective until the mortgage is released.

### Effectiveness of the Bank's Filing Under the UCC

While the Bank argues that its recording of the assignments from the debtor were effective to perfect its lien on oil produced from the assigned leaseholds even under the UCC, the trustee asserts that the Bank's filing was defective in two major respects. First, the trustee contends that the Bank's security agreements were themselves inadequate to give the Bank a security interest in extracted oil and gas, accounts, and equipment from the debtor's leaseholds because they made no mention of these items of collateral. Second, the trustee notes that no financing statements at all were filed by the Bank with regard to

---

**8.** A lender financing the production of an oil and gas lease will typically obtain a mortgage or collateral assignment of the debtor's leasehold interest as well as a security agreement covering the personal property aspects of the debtor's interest, such as oil production, accounts from sale of the oil, and equipment and fixtures used in the production process.

In many cases, a single document can be drawn to qualify as (1) a real estate mortgage covering the minerals in place, (2) a security agreement covering the minerals upon extraction and proceeds, and (3) the original financing statement, subject to periodic refiling. Another approach is to incorporate the mortgage-security agreement document as an exhibit to the financing statement.

Clark, *Secured Transactions*, ¶ 13.03[1][b], at 13–10; *see* Nimmer *Asset–Based Financing*, ¶ 23.07; *see also Northern Trust Co. v. Buckeye Petroleum Co., Inc.*, 389 N.W.2d 616 (N.D.1986): debtor's execution of open-end mortgage, security agreement, financing statement and assignment of production gave creditor bank security

interest encompassing both real and personal property aspects of debtor's oil interests.

**9.** By contrast, Oklahoma filing procedures for oil and gas security interests have been simplified by the adoption of a nonuniform amendment that allows for perfection as to all aspects of the oil and gas collateral, including equipment used in lease development, by a single filing in the real estate records. *See* Okla.Stat. tit. 12A, §§ 9–401(1)(b), 9–402(5) (1981). Under this amendment, a mortgage on realty interests may also secure personal property such as extracted oil and gas, accounts receivable, and equipment. When perfection is made by such filing, no continuation statement is required to be filed, and perfection continues so long as the mortgage is effective as to the real estate interest. *See* Harrell & Dancy, *Oil and Gas Financing Under Uniform Commercial Code Article 9*, 41 Okla.L.Rev. 53 (1988); Note, *Uniform Commecial Code—§ 9–401—Perfection of Security Interests in Minerals, Including Oil and Gas, Requires Real Estate Filing in Oklahoma*, 17 Tulsa L.J. 171 (1981).

the extracted oil and accounts. The Bank responds that the operative documents for purposes of perfection here were not the security agreements but the actual assignments of working interests, which were recorded in the real estate records as required by § 9–401(1)(b) pertaining to extracted minerals and accounts.

It goes without saying that the Bank's position could have been greatly improved by more careful documentation and that its procedures were not a model of compliance with the UCC. However, the Court must determine "after the fact" whether the Bank's documentation deviated so far from the requirements of the UCC as to be fatally defective or whether the documents relied on by the Bank fulfilled the functions prescribed by the UCC.

As the trustee observes, the security agreements executed by the debtor in September and December 1982 describe the collateral as "assignments" of listed oil and gas leases and do not specifically refer to oil production from these leases or accounts and equipment associated with the leases. Likewise, the promissory notes executed in February 1985 contain language granting a security interest in assignments of various oil and gas leases in the possession of the Bank.

■ The assignments themselves, however, describe the collateral as fractional "working interests" in specified oil and gas leases. The term "working interest" has a settled meaning in the oil and gas industry as encompassing the right to share in production or revenues from the producing venture. *Illinois National Oil & Gas Co. v. Sinclair*, 373 Ill. 581, 27 N.E.2d 450 (1940); *Hammer v. Sanders*, 6 Ill.App.2d 346, 127 N.E.2d 492 (1955), *cert. denied*, 352 U.S. 878, 77 S.Ct. 100, 1 L.Ed.2d 79 (1956); *see* 26 I.L.P. *Mining, Oil, and Gas*, § 99, at 695. Specifically, the working interest consists of a fractional share of production after payment of the royalty reserved to the lessor and payment of operat-

ing expenses. 8 Williams & Meyers, *Oil and Gas Law, Manual of Oil and Gas Terms*, at 1086 (1987). Thus, "an assignment of a three-fourths working interest means the assigning of three-fourths of the portion of the oil and gas that may be produced from the premises after the royalty for the share paid to the landlord is first deducted." *Illinois National Oil & Gas Co. v. Sinclair*, 373 Ill. at 582, 27 N.E.2d 450. As holder of an operating interest, the working interest owner also has rights to a proportionate share of equipment used in development of the lease. *See* Clark, *Secured Transactions*, ¶ 13.04, at 13–15.

■ Because of the generally understood meaning of the term "working interest" as referring to production and rights associated with the development of an oil and gas lease, the Court finds the description of collateral as the debtor's "[fractional] working interest" in specific leases to be sufficient to grant a security interest in extracted oil, accounts, and equipment from these leases. The requirement in § 9–203 that a security agreement contain a description of the collateral serves a statute of frauds function and is designed to minimize disputes over whether a particular item of collateral is covered. Ill.Rev. Stat. ch. 26, ¶ 9–203(1)(a); *see* White & Summers, *Uniform Commercial Code*, § 23–3, at 787–88 (1972). In addition to describing the interest conveyed by means of a commonly accepted term in the oil industry, the parties here executed division and transfer orders directing payment to the Bank for the oil runs from the particular leases, and it cannot be seriously contended that rights to the oil production were not included in the collateral assigned to the Bank.[10]

■ With regard to the trustee's second contention that the Bank failed to perfect its security interest in the extracted oil and accounts by filing financing state-

---

**10.** Execution of a division order provides notice to the oil purchaser to pay proceeds of an oil interest directly to the secured creditor. As such, the division order constitutes an agreement under § 9–502(1) of Article 9, which al-

lows the secured creditor to notify an account debtor to make direct payment prior to default if the parties so agree. *See* Clark, *Secured Transactions*, ¶ 13.03[2][c], at 13–14; Nimmer, *Asset–Based Financing*, § 23:29.

ments, the Bank is correct that the notice function of a financing statement may be fulfilled by filing the security documents themselves so long as the requisites of a financing statement are met. *See* Ill.Rev. Stat. ch. 26, ¶ 9-402(1). The instruments creating the security interest here, the assignments of the debtor's working interest, were filed in the real estate records of the county where the leases were located as required by § 9-401(1)(b) for land-related collateral consisting of oil sold at the wellhead and accounts arising from the sale. These assignments indicated that they covered fractional working interests in specific oil and gas leases and contained a legal description of the real estate as required by § 9-402(5). While the assignments did not recite that they were to be filed in the real estate records, they were in fact recorded there so that the purpose of this requirement was met. To the extent, then, that the individual assignments met the requirements for financing statements generally— in that they contained the names and addresses of the debtor and secured party and were signed by the debtor—they sufficed as financing statements under § 9-402, and the Bank properly perfected its security interest in the extracted oil and accounts by filing in the real estate records.

The assignments submitted as exhibits in this case vary somewhat in form and content. The majority of the assignments contain the name and address of the debtor and the name of the Bank as secured party and are signed by the debtor. Some additionally include the Bank's address. These assignments are for leases designated as the Venters–Staton Community # 1, the Kenneth Short # 1, the Carl Short # 1 & 2, the Thelma Worrell # 1, the King–Mattingly and King Carrier, the Robinson # 2, the Etienne Community # 1, the Koontz, the Ralph English # 1, and the Carl Short # 3 and 4. Finding the omission of the Bank's address to be a minor error that is not seriously misleading (*see* Ill.Rev.Stat. ch. 26, ¶ 9-402(8)), the Court rules that these assignments meet the requirements of § 9-402 for financing statements. With regard to the assignment of the Carl Short

# 3 & 4 leases, however, the filing has lapsed because it was recorded more than five years prior to the debtor's bankruptcy and no continuation statement has been filed. *See* Ill.Rev.Stat. ch. 26, ¶ 9-403(2).

The remainder of the assignments submitted as exhibits were executed by parties other than the debtor. No explanation has been given as to the relationship of the debtor to these third parties or the reason these entities executed assignments to the Bank for the debtor's account. Curiously, another assignment submitted as an exhibit appears to be a reassignment of the debtor's working interest from the Bank back to the debtor (the Rister Community # 1). The Court will not speculate as to why these latter assignments were submitted in connection with the present case but finds that they do not suffice either as security agreements or as financing statements to perfect the Bank's security interest in collateral belonging to the debtor.

The Bank makes no argument with regard to perfection of its security interest in equipment associated with the particular leases. The Bank's financing statement, while properly filed with the Secretary of State, does not adequately identify what equipment the secured party claims an interest in, as it merely lists several items of equipment with no reference to specific leases or other identifying information. Accordingly, the Court finds that the Bank's lien on equipment used on the leaseholds in question was unperfected and may be avoided by the trustee.

Because of the Court's ruling that the Bank properly perfected its security interest as to the specified leases by filing in the real estate records where the leases were located, it is not necessary to address the Bank's argument that the trustee's complaint was barred by laches. For the reasons stated, the Court finds that the Bank's lien on leasehold equipment owned by the debtor is void against the trustee under § 544(a). The Court further finds that the Bank has a perfected security interest in extracted oil and accounts attributable to the debtor's working interest from leases designated as the Venters–Staton Commu-

nity # 1, the Kenneth Short # 1, the Carl Short # 1 & 2, the Thelma Worrell # 1, the King–Mattingly and King Carrier, the Robinson # 2, the Etienne Community # 1, the Koontz, and the Ralph English # 1. The Bank's security interest in extracted oil and accounts attributable to the debtor's working interest in the Carl Short # 3 & 4 leases is void as unperfected, and the Bank is ordered to account to the trustee for payments made to it from these leases as of the date of filing of the debtor's petition.

IT IS SO ORDERED.