James R. DALY, d/b/a Rawhide Investment Company, Appellant (Defendant),

v.

James W. SHRIMPLIN, Roy Welter and Mona E. Welter, Appellees (Plaintiffs).

CITIES SERVICE COMPANY, a Delaware Corporation, Appellant (Defendant and Cross-Claimant),

v.

James W. SHRIMPLIN, Roy Welter and Mona E. Welter, Appellees (Plaintiffs).

Nos. 5192, 5193.

Supreme Court of Wyoming.

May 1, 1980.

John M. Daly, of Daly, Maycock & Anderson, Gillette, signed the brief and appeared in oral argument on behalf of appellant (defendant) in 5192.

H. W. Rasmussen and Micheal K. Shoumaker, of Badley, Rasmussen & Shoumaker, P.C., Sheridan, signed the briefs and Mr. Shoumaker appeared in oral argument on behalf of appellees (plaintiffs).

Morris R. Massey, of Brown, Drew, Apostolos, Massey & Sullivan, Casper, signed the brief and appeared in oral argument on behalf of appellant (defendant and cross-claimant) in 5193.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

ROONEY, Justice.

The appeals in the two cases here consolidated are from a single judgment which held in effect that appellant in Case No. 5192 did not have a valid security interest under the Uniform Commercial Code in an account receivable, and that appellant in Case No. 5193 did not have a right of setoff with reference to payment of an account receivable.

We reverse the effect of the judgment as to both questions, and we reverse the judgment in part and affirm it in part as it relates to the complaint, counterclaims and cross claim.

Jack F. Nuzum (hereinafter referred to as Nuzum) was in the business of hauling water to drilling sites, and he sold accounts receivable at a discount to secure operating cash. He had been selling individual accounts, without written commitment to do so and without a written sales agreement, to appellees-plaintiffs (hereinafter referred to as Shrimplin)[1] when he entered

---

1. The name "Shrimplin" is used to refer to all three appellees-plaintiffs. The Welters joined Shrimplin in discounting some of Nuzum's accounts receivable. All three of them did so with reference to the Cities Service Company's account receivable which engendered this legal action.

into a written agreement with appellant-defendant Daly (hereinafter referred to as Daly) on May 26, 1977 for the sale of his accounts receivable to Daly. The agreement included provisos that Nuzum would "not assign or sell any of his accounts receivable to any other person, firm or corporation, without the prior written consent" of Daly; that the agreement was to sell to Daly accounts "as may be acceptable" to Daly; that the agreement did not "obligate" Daly "to purchase any accounts receivable excepting those that he in his sole judgment may so decide"; and that Nuzum would "immediately cause each and every one of his invoices to have printed thereon" Daly's post office box number as Nuzum's return address. Although the agreement designated Daly "irrevocably" as Nuzum's "agent" and "true and lawful attorney" to collect the accounts, Nuzum executed a separate power of attorney to Daly which was not limited to action on the accounts sold but authorized Daly "to collect *all* checks or monies due or payable" to Nuzum and:

> "2. To give good and valid receipt for the payment of *any and all* accounts receivable which may now be due or may hereinafter become due to me, and to do any and all things in order to collect and receive payment for said accounts receivable." (Emphasis supplied.)

Daly and Nuzum also executed a financing statement which was filed on June 27, 1977 with the Campbell County Clerk and on July 6, 1977 with the Secretary of State. It recited:

> " * * * Debtor hereby certifies that he has conveyed a security interest in and to any and all accounts receivable arising as a result of work preformed [sic] by debtor from May 26, 1977, until agreement is terminated. That is to say, that secured party has a security interest to receive and [sic] and all of debtor's accounts receivable from any person firm or corporation indebted to debtor as a result of work preformed [sic] by debtor

from May 26, 1977 until agreement is terminated. Debtor specifically states that this financing statement immediately attaches all after acquired accounts receivable due and owing to him for work preformed [sic] during the time period above stated."

Nonetheless, Nuzum continued to sell and assign some individual accounts receivable to Shrimplin without first offering them to Daly and without Daly's knowledge or consent. Included among the accounts assigned and sold to Shrimplin was an account with appellant-defendant Cities Service Company (hereinafter referred to as Cities Service), represented by an invoice dated January 16, 1978 for $25,167.13. Shrimplin had knowledge of Nuzum's and Daly's financing statement when the account was assigned.

Nuzum performed services for Cities Service under an agreement which provided in part that payment for the services performed by Nuzum would be due upon completion of such services and the furnishing to Cities Service of evidence that all labor, materials, etc. used in connection with the services "have been fully * * * paid, discharged and settled"; and that Cities Service could "deduct from any sums becoming due * * * any and all sums due it * * * for damage * * * for breach of" the agreement.

Nuzum performed services on one particular well for Cities Service with the help of a subcontractor. Cities Service paid Nuzum in full for the services, but Nuzum did not pay the subcontractor. Nuzum agreed with Cities Service that the subcontractor could be paid out of the amount due on the next invoice of Nuzum. Nuzum performed additional services for Cities Service, and Cities Service deducted $5,222.88, the amount paid to the subcontractor, from the payment on the invoice for the additional services. This next invoice was the $25,167.13 invoice assigned to Shrimplin. (The account represented by this invoice is hereinafter re-

ferred to as the Pertinent Account.) It contained a stamp signed by Nuzum which read:

"I, the undersigned have assigned the invoice number 194 in the amount of $25,-167.13 to James W. Shrimplin, Box 602, Gillette, Wyoming 82716. Please forward my check to the above stated address."

Although it was the practice of Cities Service to make checks in payment of any assigned accounts to both assignor and assignee as payees, the check in payment of the Pertinent Account was made payable only to Nuzum. It was in the amount of the invoice less $5,222.88, the amount of the payment to the subcontractor. The check was sent to the address on the invoice in belief that it was Nuzum's address. It was, in fact, Daly's address. Someone in Cities Service's employ "whited out" some of the information on the Shrimplin stamp and changed the box number:

"* * * Per phone conversations with Jack Nuzum and others shortly prior to the receipt of Invoice # 194 Cities Service was to reinstate the making of payments to P.O. Box 459, Gillette, Wyoming which Cities Service understood to be Jack Nuzum's address."[2]

■ Shrimplin brought an action against Daly and Cities Service to recover the amount of the Pertinent Account invoice. Daly originally answered the original complaint and counterclaimed for monies allegedly received by Shrimplin contrary to the financing statement and contrary to the agreement between Daly and Nuzum relative to accounts receivable. However, he neither answered or counterclaimed to the amended complaint or to the amendment to the amended complaint. He thereby abandoned his counterclaim against Shrimplin.[3] Cities Service cross claimed against Daly for any amount recovered by Shrimplin from Cities Service. Daly en-

tered a counterclaim to Cities Service's cross claim. In such counterclaim, Daly sought damages resulting from payment to others by Cities Service of Nuzum's accounts which it was alleged should have been paid to Daly by virtue of the Nuzum-Daly agreement and financing statement.

After a trial to the court, judgment was entered: (1) in favor of Shrimplin against Cities Service and Daly, jointly and severally, for $19,944.25 with interest; (2) in favor of Shrimplin against Cities Service for $5,222.88 with interest; (3) in favor of Cities Service on its cross claim for indemnity against Daly, for $19,944.25; and (4) in favor of Cities Service on Daly's counterclaim against it.

### CASE NO. 5192

Case No. 5192 is an appeal by Daly from the judgment insofar as it is against him, and he does not present any direct argument relative to his counterclaim against Shrimplin.

■ The transaction here involved is governed by the Uniform Commercial Code (§§ 34–21–101, et seq., W.S.1977) and particularly by Article 9 thereof (§§ 34–21–901 through 34–21–966, W.S.1977) having to do with "Secured Transactions: Sales of Accounts, Contract Rights and Chattel Paper."

Section 34–21–902(a) of that Code provides:

"(a) Except as otherwise provided in section 9–103 [§ 34–21–903] on multiple state transactions and in section 9–104 [§ 34–21–904] on excluded transactions, this article applies so far as concerns any personal property and fixtures within the jurisdiction of this state:

"(i) To any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents,

---

2. Cities Service's answer to one of Shrimplin's interrogatories. Daly refused to turn over the $19,944.25 to Shrimplin, and acknowledged that he had not paid Nuzum any cash for the Pertinent Account.

3. The failure of Daly to formulate issues by an answer to the amended complaint and to the amendment to the amended complaint was cured by the pretrial conference and by subsequent trial in accordance with Rules 15(b) and 16, W.R.C.P.

instruments, general intangibles, chattel paper, account or contract rights; and also

"(ii) *To any sale of accounts*, contract rights or chattel paper." (Emphasis supplied.)

The only transaction of possible pertinency to this case excluded by § 34–21–904, W.S. 1977, referred to in the foregoing, is that in subsection (a)(vi): "* * * an assignment of accounts * * * which is for the purpose of collection only * * *." Contrary to the facts in this case, a "collection only" assignment does not involve an advance of money. Rather, the money is paid only if the collection is made. This exclusion applies only to assignments of a noncommercial nature and not to those which are financing in nature. *Bramble Transportation, Inc. v. Sam Senter Sales, Inc.,* Del.Super., 294 A.2d 97 (1971), affirmed 294 A.2d 104 (1972); *Vittert Construction and Investment Company v. Wall Covering Contractors, Inc.,* Mo.App., 473 S.W.2d 799 (1971). Thus, the exclusion is not here applicable.

An "account" is defined in § 34–21–906, W.S.1977, as "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper."

■ Accordingly, both the sale of accounts receivable by Nuzum to Daly and the sale thereof to Shrimplin were transactions subject to Article 9 of the Uniform Commercial Code. As stated in the Official Comment to § 34–21–902, W.S.1977:

"* * * Commercial financing on the basis of accounts, contract rights and chattel paper is often so conducted that the distinction between a security transfer and a sale is blurred, and a sale of such property is therefore covered by subsection (1)(b) [§ 34–21–902(a)(ii), W.S.

1977] *whether intended for security or not,* unless excluded by Section 9–103 [§ 34–21–903, W.S.1977] or Section 9–104 [§ 34–21–923, W.S.1977, quoted in pertinent part, infra]. *The buyer then is treated as a secured party, and his interest as a security interest. * * *"* (Emphasis and bracketed material supplied.) 3 U.L.A.-U.C.C., p. 21 (1968).

■ The relative priorities of Daly and Shrimplin to the Pertinent Account can be determined by reference to five sections of the Uniform Commercial Code:

1. Section 34–21–941(e), W.S.1977, provides that conflicting security interests in the same collateral shall be determined as follows:

"(i) In the order of filing if both are perfected by filing, regardless of which security interest attached first under section 9–204(1) [§ 34–21–923(a)] and whether it attached before or after filing;

"(ii) In the order of perfection unless both are perfected by filing, regardless of which security interest attached first under section 9–204(1) [§ 34–21–923(a)] and, in the case of a filed security interest, whether it attached before or after filing; and

"(iii) In the order of attachment under section 9–204(1) [§ 34–21–923(a)] so long as neither is perfected."

Subsection (f) of the same section provides:

"(f) For the purpose of the priority rules of the immediately preceding subsection, *a continuously perfected* security interest shall be treated at all times as if perfected by filing if it was originally so perfected * * *." (Emphasis supplied.)

Inasmuch as Daly filed his financing statement, thus perfecting it, and Shrimplin did not, Daly would prevail.[4]

---

4. Section 32–21–930(a), W.S.1977, states in pertinent part:

"* * * [A]n unperfected security interest is subordinate to the rights of:

"(i) Persons entitled to priority under section 9–312 [§ 34–21–941];"

Such has been held to be true although the holder of the perfected security interest had

knowledge of the earlier in time but unperfected security interest. *In re Smith,* D.C.Minn., 326 F.Supp. 1311, 1313 (1971). The court there said:

"* * * It is appropriate then to provide that a secured party who fails to file runs the risk of subordination to a later but more diligent party. * * *"

But Shrimplin contends that Daly did not have a security interest in the first instance and therefore his filing was without effect.

2. Section 34–21–120(a)(xxxvii), W.S. 1977 defines a "security interest" as:

"* * * [A]n interest in personal property * * * which secures payment of performance of an obligation. * * * The term *also includes any interest of a buyer of accounts*, * * * which is subject to article 9. * * * " (Emphasis supplied.)

Under this definition, Daly, as a buyer of accounts, definitely had a security interest. But Shrimplin contends the security interest did not attach under the requirements of § 34–21–923(a), W.S.1977.

3. Section 34–21–923 states in pertinent part that:

"(a) A security interest cannot attach until there is agreement (subsection (3)[(c)] of section 1–201 [§ 34–21–120]) that it attach and value is given and the debtor has rights in the collateral. It attaches as soon as all of the events in the preceding sentence have taken place unless explicit agreement postpones the time of attaching.

"(b) For the purposes of this section the debtor has *no rights*:

\* \* \* \* . \* \*

"(iv) In an account until it comes into existence."

Three things are here made a condition for the attaching of a security interest: (a) that there is agreement that it attach—the bargain of Daly and Nuzum was that Daly would buy those accounts receivable of Nuzum which were acceptable to him and that Nuzum would not sell or assign any of his accounts receivable to anyone else without Daly's consent. It was accompanied by a power of attorney under which Daly could collect all monies due Nuzum. The intent to consummate the agreement was exhibited by the execution and filing of the financing statement. The plain words of the

agreement reflect that it attached to all of Nuzum's accounts receivable; (b) that the debtor had rights in the collateral—Nuzum had rights in the accounts receivable as they came into existence as expressly specified in subsection (b)(iv) of § 34–21–923, supra; (c) that value is given—the consideration received by Nuzum consisted of the cash advanced, the immediate availability of additional cash as accounts matured and the resulting ability to stay in business.[5] Value is defined in § 34–21–120(a)(xliv), W.S.1977.

4. Section 34–21–120(a)(xliv), in defining value, provides in part:

"(xliv) * * * a person gives 'value' for rights if he acquires them:

"(A) * * * for the extension of immediately available credit whether or not drawn upon * * *.

\* \* \* \* \* \*

"(D) Generally, in return for any consideration sufficient to support a simple contract."

Nuzum was extended "immediately available credit." This fact, plus the cash advanced, plus the ability to stay in business, made the consideration to support a simple contract. Daly's security interest properly attached to the Pertinent Account, and it was perfected when he filed the financing statement pursuant to § 34–21–931(a), W.S. 1977.

5. Section 34–21–931(a) provides in pertinent part:

"(a) *A financing statement must be filed to perfect all security interests except the following*:

\* \* \* \* \* \*

"(v) An assignment of accounts or contract rights which does not alone *or in conjunction with* other assignments to the same assignee transfer a significant part of the outstanding accounts or

Accord, *First National Bank and Trust Company of Vinita, Oklahoma v. Atlas Credit Corporation*, 10th Cir. 1969, 417 F.2d 1081.

**5.** A banker advised Daly that he would not touch Nuzum "with a ten-foot pole."

contract rights of the assignor;" (Emphasis supplied.) [6]

Daly was before Shrimplin in all aspects of the priority schedule relative to accounts receivable and would have priority whether the sale of the accounts sold to Shrimplin (including the Pertinent Account) were less than a "significant part of the outstanding accounts" or whether they were more.[7] If less, Daly's priority arose from first attaching of his security interest. If more, it arose from first perfection and filing. Assuming the sales to Shrimplin to be less than a "significant part," Daly's security interest attached when the last of the three requirements of § 34–21–923(a), W.S.1977 occurred, i. e., when Nuzum obtained rights in the Pertinent Account; and, if Shrimplin had a security interest, it could only attach when Nuzum signed the stamp which was placed on the invoice for the Pertinent Account, a time subsequent to the time Nuzum obtained rights in the Pertinent Account. Assuming the sales to Shrimplin to be more than a "significant part," Daly filed and perfected his interest and Shrimplin did not. In any, event, neither Shrimplin or Daly were within the § 34–21–931(a)(v), W.S.1977 exception inasmuch as each regularly made purchases and took assignments of accounts receivable from Nuzum.[8] Daly perfected his security interest. Shrimplin did not. Therefore, Daly had a valid security interest in the Pertinent Account.

Accordingly, Daly's priority over Shrimplin in the Pertinent Account is established pursuant to the foregoing five sections of the Uniform Commercial Code. The result reached in this case by the trial court resulted from it having treated the Pertinent Account as an individual transaction and not a part of an overall accounts receivable transaction. Such treatment as an individual transaction is not in accordance with the provisions of the Uniform Commercial Code. Section 34–21–923 provides in pertinent part:

"(c) * * * [A] security agreement may provide that collateral, *whenever acquired*, shall secure all obligations covered by the security agreement.

* * * * * *

"(e) Obligations covered by a security agreement *may include future advances* or other value *whether or not the advances or value are given pursuant to commitment.*" (Emphasis supplied.)

Nor is it in accordance with: (1) the purpose and concept of the Code; or (2) to the practical effect of sales of accounts receivable in normal business activities relative to them.

Financing statements are filed to give constructive notice to all others of the security interest to which the property is subject. Section 34–21–951, W.S.1977, sets forth the formal requisites of financing statements. It provides in part:

---

**6.** The other exceptions refer to transactions which are not applicable to assignment and sale of accounts receivable, such as collateral in possession of secured party, purchase money, certificates of title, etc.

**7.** Official Comment 5 to this subsection states the purpose of the exemptions therein provided is:

"* * * to save from ex post facto invalidation casual or isolated assignments: some accounts receivable statutes have been so broadly drafted that all assignments, whatever their character or purpose, fall within their filing provisions. Under such statutes many assignments which no one would think of filing may be subject to invalidation. The subsection (1)(e) exemptions go to that type of assignment. *Any person who regularly takes assignments of any debtor's accounts*

*should file. * * *"* (Emphasis supplied.) 3 U.L.A.-U.C.C., p. 151 (1968).

Courts have not been uniform in resolving the conflict between the "significant part" language of the subsection (usually converted to a percentage test) and the "casual and isolated" language of the comment. See Annot., 85 A.L.R.3d 1050, *and see* Wash.L.Rev. *note at* Vol. 53:511 (1978) for an excellent review of the conflict. The holding in *Craig v. Gudim,* Wyo., 488 P.2d 316 (1971) is that one relying on the exception has the burden of showing that the assignment did not transfer a significant part of the outstanding contract rights of the assignor. Shrimplin and Daly regularly took assignments from Nuzum, they are not within the exception in any event, and we need not address the conflict.

**8.** See footnote 7.

"(a) * * * A financing statement may be filed *before* a security agreement is made *or a security interest otherwise attaches.* * * * " (Emphasis supplied.) "* * * The purpose of the filed statement or agreement is to give the minimum information necessary to put a searcher on inquiry. The section contemplates that the complete state of affairs will be learned only after such inquiry. * * * " *Bank of North America v. Bank of Nutley,* 94 N.J.Super. 220, 227 A.2d 535, 539 (1967).

"* * * [A] security agreement is effective according to its terms between the parties, *against purchasers of the collateral* and against creditors. * * * " (Emphasis supplied.) Section 34–21–920, W.S.1977.

" '* * * [T]his Court must apply the statute in a manner consonant with the literal meaning of its terms and in a manner to best effectuate its overriding purpose.' * * *

  *   *   *   *   *   *

"If notice filing under the code has any efficacy or future value in the commercial world, it must be honored in this case * * *. The 'first-to-file' rule of U.C.C. § 9–312(5)(a) must be recognized." *First National Bank and Trust Company of Vinita, Oklahoma v. Atlas Credit Corporation,* supra footnote 4, 417 F.2d at 1083, 1085.

We would weaken the purpose and concept of the Code if we do not hold Shrimplin to be bound by that he would have discovered through inquiry made as a result of the notice given to him by Daly's filing pursuant to Code provisions.

Accounts receivable normally are sold for the purpose of obtaining immediate cash. Purchasers of accounts receivable usually will not advance cash on accounts of questionable collectability. They may not desire to be involved in collections of accounts of small amounts, or they may not be able to afford an account of an extremely large

amount. It is common practice to include a condition in agreements for sale and purchase of accounts receivable that the purchaser may refuse to purchase any account at his option.[9] See 19 Am.Jur. Legal Forms 2d §§ 253:3175, 253:3182, 253:3063.1, 253:3064.1 (1974, 1979 Cum.Supp.); Modern Legal Forms, §§ 1982, 1983, 1985 (1965, 1979 Pocket Part). Such is necessary in the practical operation of business affairs.

Finally in this respect, the agreement between Nuzum and Daly required Nuzum to put Daly's address on every invoice. Thus payment for every invoice would go through Daly's hands, whether or not he had prior knowledge of the specific account or whether or not he had prior conversation with Nuzum concerning it. Daly could extract his percentage before remitting to Nuzum. He could also exercise his right to refuse to purchase the account at that time—although such a refusal would not be rational. This possibility would place the onus on Nuzum to notify Daly as soon as the services were rendered to the debtor so that he (Nuzum) could have use of the money without waiting for the thirty, sixty or ninety days or more for payment to be made by the debtor. It would be poor business practice on his part not to do so. The agreement provision requiring Daly's address on the invoices had the practical effect of transferring all future accounts receivable to Daly, subject only to a condition that he could refuse those not acceptable to him. It emphasizes the overall nature of the transaction, rather than it being a series of separate sales or transactions.

■ Nuzum definitely breached his agreement with Daly by selling accounts to Shrimplin without Daly's knowledge or consent. The status given by the Uniform Commercial Code to *sales* of accounts receivable resulted in the filing of a financing statement by Daly. Shrimplin must be taken to have had constructive notice of the arrangement between Daly and Nuzum. The financing statement was worded in a fashion whereby explicit notice was given

---

9. Such options are not as material in assignments of accounts to secure loans (as distin-guished from outright sales), which loans are usually secured by other collateral.

of Daly's positive interest in all of Nuzum's accounts receivable, including the Pertinent Account. Inquiry by Shrimplin as a result of such notice would have informed him of Nuzum's inability to sell the Pertinent Account without Daly's consent. It would have revealed the power of attorney. Daly's security interest would have been verified. Shrimplin, therefore, purchased the Pertinent Account at his peril.

## CASE NO. 5193

Case No. 5193 is an appeal by Cities Service from the judgment against it and in favor of Shrimplin for the $5,222.88. Since Shrimplin's interest in the Pertinent Account was subordinate to that of Daly, Shrimplin would not have an enforceable claim against Cities Service for the $5,222.88 setoff.

Regardless of the respective priorities of Daly and Shrimplin, neither of them would have had such claim. Section 34–21–947(a), W.S.1977, provides in pertinent part that "the rights of an assignee of an account debtor are subject to:

"(i) All the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and

"(ii) Any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment."

The contract between Cities Service and Nuzum set forth the "defense or claim" arising from breach of the contract. The breach was failure of Nuzum to have "fully paid, discharged and settled" the subcontractor's claim. The contract authorized deduction for the breach from "any sums *becoming* due" as well as from "any and all sums due it."

"(c) The account debtor is authorized to pay the assignor until the account debtor receives notification that the account has been assigned and that payment is to be made to the assignee. A notification which does not reasonably identify the rights assigned is ineffective. If requested by the account debtor, the assignee must seasonably furnish reasonable proof that the assignment has been made and unless he does so the account debtor may pay the assignor." Section 34–21–947(c), W.S.1977.

"(xxvi) A person 'notifies' or 'gives' a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it. A person 'receives' a notice or notification when:

"(A) It comes to his attention; or

"(B) It is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications." Section 34–21–120(a)(xxvi), W.S.1977.

Beyond that, the general rule is that an assignee of a chose in action takes it subject to all defenses, including setoffs, existing at the time of the assignment. As paid in *Associates Loan Company v. Walker*, 76 N.M. 520, 416 P.2d 529, 531 (1966):

"The fundamental rule of law, unchanged by the quoted section of the Uniform Commercial Code, is that an assignee of a chose in action acquires by virtue of his assignment nothing more than the assignor had and all equities and defense which could have been raised by the debtor against the assignor are available to the debtor against the assignee."

See 69 Am.Jur.2d Secured Transactions §§ 451, 452, 453, 455, and 456 (1973).

## CONCLUSION

The judgment in favor of Shrimplin on his claim against Daly and Cities Service is reversed. Nuzum is not a party in this case, and he may have a right to the monies collected by Daly on the Pertinent Account, except for the six percent discount thereon as provided in paragraph 2 of the agreement between them. The existence or extent of Shrimplin's rights against Nuzum are not before us in this case.

Inasmuch as Shrimplin will not recover on his claim against Cities Service, Cities

Service cannot recover on its cross claim against Daly, the cross claim having for its purpose the recovery of any amount recovered by Shrimplin against Cities Service. The judgment in favor of Cities Service against Daly is therefore reversed.

■ The judgment in favor of Cities Service against Daly on Daly's counterclaim to Cities Service's cross claim is affirmed inasmuch as Cities Service did not have knowledge of Nuzum's sales agreement with Daly until after all of the involved invoices were paid, either to Nuzum or to Shrimplin pursuant to Nuzum's direction. Cities Service did not know that Daly's address on the invoices was not that of Nuzum. The mere presence of Daly's address on the invoices, without more, was not notice of the sale of accounts receivable to Daly. The notice was not given as necessary to make Cities Service liable for its payments to Nuzum and Shrimplin.

Reversed in part, and affirmed in part.