OCTAGON GAS SYSTEMS, INC., Appellant,

v.

Roy T. RIMMER, Appellee,

In re MERIDIAN RESERVE, INC., Debtor.

No. 92–6065.

United States Court of Appeals, Tenth Circuit.

May 27, 1993.

---

* Henry G. Cisneros is substituted for his predecessor, Jack Kemp, as Secretary of Department of Urban Development. Fed.R.App.P. 43(c)(1).

Thomas J. Moore (Christian C. Onsager, Adrienne O. McNamara, with him on the brief), of Faegre & Benson, Denver, CO, for appellant.

John C. Platt (Joe E. Edwards, Joel W. Harmon, with him on the brief), of Edwards, Sonders & Propester, Oklahoma City, OK, for appellee.

Before TACHA, SETH, and BALDOCK, Circuit Judges.

BALDOCK, Circuit Judge.

Octagon Gas Systems, Inc. ("Octagon") appeals from the decision of the United States District Court for the Western District of Oklahoma affirming the bankruptcy court's order granting Appellee Roy T. Rimmer's motion for summary judgment. We have jurisdiction under 28 U.S.C. § 158(d).

Poll Gas, Inc. ("Poll") was in the business of gathering and selling natural gas in Oklahoma. As part of its business, Poll owned and operated a gas gathering system ("the System"). Prior to 1976, Amcole Energy Corporation ("Amcole") owned ten percent of the Poll stock and four other shareholders owned the remainder of the stock. In May 1976, Amcole entered into an agreement with Poll's remaining four shareholders to purchase all of their shares. Pursuant to the terms of the purchase agreement ("the 1976 Agreement") between Amcole and the other shareholders, the selling shareholders agreed to sell Amcole their 90% of the Poll stock and certain other assets. In exchange, Amcole transferred to each shareholder a proportionate "overriding royalty interest" in the gross proceeds received by Amcole from gas sold through the Poll System. As a result of the 1976 Agreement, Amcole became Poll's sole remaining shareholder. Approximately one-half of Rimmer's "overriding royalty interest" originates from the 1976 Agreement.

On May 31, 1982, Poll, assigned to SINA 79/80 Limited ("SINA") an "overriding royalty interest" in the gross proceeds derived from the Poll System. The remaining half of

Rimmer's "overriding royalty interest" arises from the 1982 Assignment.

In 1983 and 1984, Rimmer purchased, from the original assignees, a portion of the "overriding royalty interests" created by the 1976 Agreement and the 1982 Assignment. Subsequently, on January 28, 1987, Amcole, Poll, and Rimmer executed an agreement entitled Assignment of Overriding Royalty Interest ("1987 Assignment"). *See infra* note 3. Pursuant to the parties' various cross-transfers, the 1987 Assignment provided that "... Rimmer will own from this date forward a full Five Percent (5%) perpetual overriding royalty interest on all proceeds payable to [Poll] under the [System]...." Appellant's App. at 83–86.

In 1988, Poll commenced this Chapter 11 bankruptcy case. Prior to filing the petition in bankruptcy, Poll, pursuant to the 1987 Assignment, paid Rimmer five percent of its proceeds from the sale of gas through the System. During the pendency of the bankruptcy estate, the bankruptcy trustee continued to pay this five percent interest to Rimmer.

In January 1990, the bankruptcy court confirmed the trustee's reorganization plan. Under the plan, the Poll System [1] was conveyed to Norwest Bank Minnesota ("Norwest") or its designee, in satisfaction of Norwest's secured claim. The Plan provided that the Poll System would be transferred to Norwest "free and clear of liens, claims, interests, and encumbrances." Appellant's App. at 130. Thereafter, Norwest conveyed the System to Octagon. After assuming control of the System, Octagon refused to recognize any interest held by Rimmer in the System gas sale proceeds and failed to make any payments to Rimmer. Consequently, this action was commenced by a creditor of Rimmer, Bonnet Resources Corporation, alleging it is secured by Rimmer's interest in the System's gas sale proceeds. Rimmer subsequently brought a motion for intervention. The bankruptcy court granted Rimmer's motion and exercised jurisdiction to determine whether the Plan effectuated a transfer of Rimmer's five percent interest to Octagon, or whether Rimmer's interest survives as personal property owned by Rimmer.

On cross motions for summary judgement, the bankruptcy court held that Rimmer owned a five percent interest in the proceeds of gas sold through the Poll System which was not affected by the Plan or the transfer of the Poll System to Octagon. The court, rejecting Octagon's argument that Article 9 of the Uniform Commercial Code ("U.C.C.") applied, reasoned that Rimmer's partial interest in the proceeds from the sale of gas was a "good" and amounted to a proportionate ownership right. The court found that Rimmer's interest was not property of Poll's bankruptcy estate and therefore could not be transferred by the estate to Octagon. The bankruptcy court granted summary judgment in favor of Rimmer, and the district court summarily affirmed.

On appeal Octagon raises numerous issues, among them: (1) whether the bankruptcy court erred in finding that Rimmer had an interest in the Poll System gas sale proceeds, and (2) whether the bankruptcy court erred in determining that Article 9 of the U.C.C. was inapplicable to Rimmer's interest. Because we remand in order for the court to apply Article 9, we do not address Octagon's remaining issues.

■ We review a court's order granting summary judgment de novo. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990). We examine the record to determine whether any genuine issue of material fact exists, and, if not, whether the substantive law was applied correctly. *Hokansen v. United States,* 868 F.2d 372, 374 (10th Cir.1989) (citation omitted).

## I.

■ Octagon argues that Rimmer had no enforceable interest in the Poll System gas sales proceeds. Octagon's only argument concerning this issue that merits extensive discussion pertains to the 1976 Agree-

---

1. The Poll System included all gas purchase and sales contracts pursuant to which the System buys and sells gas and all accounts receivable from the sale of gas or gas liquids by the System.

ment.[2]  Octagon contends that because Poll was not a party to the 1976 Agreement, the portion of Rimmer's interest that derives from the 1976 Agreement is not an enforceable interest in the Poll System gas sale proceeds; rather it is only an enforceable interest against Amcole in the amount Amcole received from Poll.[3]

Whether or not Rimmer has an enforceable interest in the Poll System proceeds and the characterization of that claimed interest are matters of state law. *See Paul v. Monts*, 906 F.2d 1468, 1475 (10th Cir.1990).  In construing the meaning of a written contract, the intent of the parties controls. *Founders Bank & Trust Co. v. Upsher*, 830 P.2d 1355, 1361 (Okla.1992) (citing Okla.Stat.Ann. tit. 15, §§ 151–153 (West 1981)).  Where the language of the contract alone does not clearly set forth the intent of the parties, the court may look to extrinsic evidence.  *See Panhandle Coop. Royalty Co. v. Cunningham*, 495 P.2d 108, 112–113 (Okla.1971); *Pollock Stores Co. v. Draper*, 202 Okl. 546, 215 P.2d 843 (1950).

Although Poll was not a party to the 1976 Agreement, the portion of Rimmer's interest that derives from the 1976 Agreement is an enforceable interest in the Poll System's gas sale proceeds.  First, we hold that the intention of the parties is not clearly ascertainable from the writing alone.[4]  As a result, we look to the parties' course of dealing and the undisputed affidavit of one of the parties—Frank Cole, president of Amcole in 1976—which clearly indicate that the intent of the parties was to create enforceable interests in the Poll System's gas sale proceeds,

not interests in proceeds Amcole received from Poll.  Throughout the nearly fourteen years following the execution of the 1976 Agreement, Poll itself, not Amcole, paid the owners of the interests conveyed in the 1976 Agreement their proportionate share of Poll's proceeds.  According to Cole, the parties' intent was that Amcole's sole obligation with respect to the payment of the created interests arose from its status, following the 1976 Agreement, as Poll's sole shareholder.  The parties intended that the created interests were in Poll's proceeds, not in Poll proceeds received by Amcole.

Of course, the 1976 Agreement could not have created interests in the Poll System gas sale proceeds unless the parties to the 1976 Agreement had the capacity to bind Poll to the Agreement and sell interests in Poll's proceeds, or unless Poll subsequently ratified the Agreement.  Contracts involving all of a corporation's shareholders are binding on the corporation, 12B William M. Fletcher, *Fletcher's Cyclopedia of the Law of Private Corporations*, § 5743 (perm. ed. rev. vol. 1984), and under Oklahoma law in effect in 1976, shareholders had the right to authorize the disposition of corporate assets, Okla. Stat.Ann. tit. 18, § 1.164(b) (West 1971) (repealed 1986).  Additionally, a corporation, by subsequent action, may ratify a contract entered in its behalf.  *East Ctr. Okla. Elec. Coop., Inc. v. Oklahoma Gas & Electric Co.*, 505 P.2d 1324, 1329 (Okla.1973).  We hold that under either theory, the 1976 Agreement created an enforceable interest in Poll's proceeds.

**2.**  As to Octagon's other arguments, we reject Octagon's contention that even if Rimmer had an interest in Poll's proceeds, he had no interest in Octagon's proceeds.  If Rimmer had an interest in the Poll System's gas sale proceeds, it would have survived the sale of the System to Octagon. *See supra* note 1 (Poll System ultimately conveyed to Octagon included accounts receivable from the System's sale of gas).  Further, given our conclusions in part II, *infra*, we need not address Octagon's arguments that Rimmer did not "own" a five percent interest in Poll's proceeds.

**3.**  As a threshold matter, we agree with the bankruptcy court that the use of the term "overriding royalty interest" in the underlying transactions is

technically incorrect for lack of an oil and gas leasehold estate.  *See* Appellant's App. at 63.  Nevertheless, the transactions created an enforceable interest in the Poll System's gas sale proceeds.  *See infra.*

**4.**  The language of the 1976 Agreement is ambiguous.  For example, the Agreement specifies that the interests created in favor of the selling shareholders are interests in the proceeds *received by Amcole* through the Poll System.  However, Amcole itself received, under the 1976 Agreement, one of these interests in the amount of ten percent.  In other words, to give this phrase its literal effect, we would have to conclude that Amcole made an agreement to pay itself.

All of Poll's shareholders and directors were parties to the 1976 Agreement. This being the case, the shareholders had the capacity to dispose of Poll's assets and bind Poll to the Agreement. Because this was the intent of the parties, the effect of the 1976 Agreement was to create enforceable interests in Poll's proceeds. Alternatively, Poll's continuous payment of the interests over nearly fourteen years evidences its ratification of the 1976 Agreement. *See Blunt v. Blunt,* 198 Okl. 138, 176 P.2d 471, 472 (1947). Because we hold that the 1976 Agreement, in addition to the 1982 Assignment and the 1987 Assignment, created an enforceable interest in the Poll System gas sale proceeds, we uphold the bankruptcy court's determination that Rimmer had an interest in the Poll System's gas sale proceeds.

## II.

Throughout this litigation, Octagon has maintained that Rimmer's interest is an "account" governed by Article 9 of the U.C.C. as adopted by Oklahoma. Rimmer has conceded that his interest is an "account," but argues that regardless of Article 9, he "owns" the interest, not Poll, and therefore his interest has never been property of Poll's bankruptcy estate. The bankruptcy court held that Article 9 was inapplicable because Article 9 provides a classification of interests for the purpose of determining competing secured interests, "not a classification for the creation of an ownership right in personal property." Order of July 26, 1991 at 6–7, *In Re Meridian Reserve, Inc.,* No. BK–88–06519–BH, (Bankr.W.D.Okla. July 29, 1990).

■ "Article [9 of the U.C.C.] sets out a comprehensive scheme for the regulation of security interests in personal property and fixtures." Okla.Stat.Ann. tit. 12A, § 9–101 (West 1963) (Official Comment). The aim of Article 9 is "to provide a simple and unified structure within which the immense variety of present-day secured financing transactions can go forward with less cost and with greater certainty." *Id.* As a means towards achieving this end, Article 9 lays out the steps a party must take to create a valid security interest. *See* Okla.Stat.Ann. tit. 12A, art. 9 pt. 2 (West 1963 & Supp.1993).

These steps include "attachment" of a security interest, and "perfection" of the interest. *See* Okla.Stat.Ann. tit. 12A, §§ 9–204, 9–302 to 9–305 (West Supp.1993). Article 9 also provides for priority among competing claims of purchasers and creditors of the debtor. *See* Okla.Stat.Ann. tit. 12A, art. 9 pt. 3 (West 1963 & Supp.1993). Although Article 9 applies mainly to transactions intended to create security interests, it also applies to sales of accounts, Okla.Stat.Ann. tit. 12A, § 9–102(1)(b) (West Supp.1993), because sales of wholly intangible interests in accounts create the same risks of secret liens inherent in secured transactions. *See* Dan T. Coenen, *Priorities in Accounts: The Crazy Quilt of Current Law and a Proposal for Reform,* 45 Vand.L.Rev. 1061, 1073–74 (1992).

As a starting point in our analysis, we must determine whether Rimmer's interest in the Poll System's gas sale proceeds is an "account" as defined by Article 9 of the U.C.C. as adopted by Oklahoma. *See* Okla. Stat.Ann. tit. 12A, §§ 9–101 to 9–507 (West 1963 & Supp.1993). Article 9 applies to transactions involving personal property. Okla.Stat.Ann. tit. 12A, § 9–102(1) (West 1963). One form of personal property to which Article 9 applies is an "account" which is defined as "any right to payment for goods sold ... which is not evidenced by an instrument or chattel paper." Okla.Stat.Ann. tit. 12A, § 9–106 (West Supp.1993). Section 9–105(1)(h) states that "goods" includes "all things which are movable at the time the security interest attaches ... but does not include ... minerals or the like, including oil and gas, *before extraction.*" *Id.* § 9–105(1)(h) (emphasis added).

■ Natural gas, once extracted, becomes personal property in Oklahoma, *Continental Supply Co. v. Marshall,* 152 F.2d 300, 305 (10th Cir.1945), *cert. denied,* 327 U.S. 803, 66 S.Ct. 962, 90 L.Ed. 1028 (1946), and as such, is subject to Article 9. Also, by negative implication, section 9–105(1)(h) indicates that minerals, including gas, *following extraction,* come within Article 9's definition of a "good." *See In Re Fullop,* 125 B.R. 536, 539–40 (Bankr.S.D.Ill.1990), *aff'd,* 133 B.R. 627 (S.D.Ill.1991); Barkley Clark, *The Law of Secured Transactions Under the Uniform*

*Commercial Code,* ¶ 13.3[1] (1980). Here, the gas sold is extracted. Because extracted gas is a "good," Poll's right to payment for gas sold, as well as Rimmer's five percent interest in Poll's right to payment, is an account.

Having determined that the interest acquired by Rimmer is an account under Article 9, it follows that Article 9 applies to Rimmer's five percent interest in the Poll System's gas sale proceeds (hereinafter referred to as "Rimmer's account"), even though the transactions giving rise to Rimmer's account were not intended to secure a debt. The U.C.C. Official Comment 2 to Okla.Stat.Ann. tit. 12A, § 9–102 (West Supp. 1993), explains that in the case of commercial financing on the basis of accounts, "the distinction between a security transfer and a sale is blurred, and a sale of such property is therefore covered by [9–102(1)(b) ] *whether intended for security or not.* The buyer is then treated as a secured party and his interest as a security interest." (emphasis added). Section 9–102(1)(b) states that Article 9 applies "to any outright sale of accounts." Further, the term "security interest" as defined by Article 9, expressly includes "any interest of a buyer of accounts," Okla.Stat.Ann. tit. 12A, § 1–201(37) (West Supp.1993), and "secured party" includes "a person to whom accounts ... have been sold." *Id.* § 9–105(1)(m). Additionally, section 9–105(1)(d) defines "debtor" as including "the seller of accounts," and, under section 9–105(1)(c), "collateral" includes "accounts ... which have been sold." These provisions clearly indicate that the buyer of an account is treated as a secured party, his interest in the account is treated as a security interest, the seller of the account is a debtor, and the account sold is treated as collateral.[5]

We must now determine whether the fact of Poll's bankruptcy alters the application of Article 9 to Rimmer's account. Under § 541 of the Bankruptcy Code, the property of the bankrupt's estate includes, "all legal or equitable interests of the debtor in property as of the commencement of the case." In *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983), the Supreme Court, noting that § 541 has an expansive scope, determined that § 541 merely defines what is included in the bankrupt's estate rather than placing a limit on the scope of the estate. *Id.* at 203, 103 S.Ct. at 2312. The Court also pointed out that, under § 541, property of the bankrupt's estate includes any property subject to a security interest. *Id.* at 203–04, 103 S.Ct. at 2312–13. The impact of applying Article 9 to Rimmer's account is that Article 9's treatment of accounts sold as collateral would place Rimmer's account within the property of Poll's bankruptcy estate. Further, if it is determined that Rimmer's account was not properly perfected, then, upon Poll's filing of bankruptcy, the bankruptcy trustee as a lien creditor would have a security interest superior to that of Rimmer.[6] *See In Re Reliance Equities, Inc.,* 966 F.2d 1338, 1344 (10th Cir.1992); *United States v. Trigg,* 465 F.2d 1264, 1269 (8th Cir.1972), *cert. denied,* 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 270 (1973); *In Re Cripps,* 31 B.R. 541, 543 (Bankr. W.D.Okla.1983).

Rimmer contends, and the bankruptcy court held, that because Rimmer "bought" the account, he had title to the account and "owned" the account, and Poll no longer had any ownership interest in the account. Therefore, Rimmer argues, when Poll filed for bankruptcy, Poll's bankruptcy estate did not include Rimmer's account. Although acknowledging that Article 9 applies to sales of accounts, Rimmer argues that when deciding

---

**5.** This application of Article 9 to sales of accounts has also been developed in case law. *See e.g., Major's Furniture Mart, Inc. v. Castle Credit Corp.,* 602 F.2d 538 (3d Cir.1979); *United States v. Trigg,* 465 F.2d 1264 (8th Cir.1972), *cert. denied,* 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 270 (1973); *In Re Flowers,* 78 B.R. 774 (Bankr. D.S.C.1986); *In Re Cripps,* 31 B.R. 541 (Bankr. W.D.Okla.1983); *Daly v. Shrimplin,* 610 P.2d 397 (Wyo.1980).

**6.** Under the Bankruptcy Code, the bankruptcy trustee has the rights of a hypothetical lien creditor. 11 U.S.C. § 544; *see also* 4 *Collier on Bankruptcy,* ¶ 544.02 (Lawrence P. King ed., 15th ed. 1993). Accordingly, the trustee prevails over an Article 9 claimant whose interest is unperfected as of the date of filing of bankruptcy. Okla. Stat.Ann. tit. 12A, § 9–301(1)(b) (West Supp. 1993).

whether the account is property of the bankrupt's estate, the sale of an account must be distinguished from the transfer of an account for security. Simply put, Rimmer's argument rests on the principle that he, not Poll, owned the account as of the date of the sale.

■ We do not agree that the assignment of the account to Rimmer effectuated a transfer to Rimmer of all property interests in the account, leaving Poll with no property interest in Rimmer's account which the bankruptcy trustee could reach under 11 U.S.C. § 541. Rimmer has advanced no sound argument, based either on post-U.C.C. case law or policy, as to why Article 9 should not be applied here. In fact, our review of the structure of Article 9, the available case law, and the policies underlying Article 9 and the Bankruptcy Code convinces us that a debtor's sale of an account, prior to filing for bankruptcy, does not necessarily place that account beyond the reach of the bankruptcy trustee.

■ As the Eighth Circuit explained in *United States v. Trigg,* 465 F.2d at 1268, Article 9 does not attempt to classify a debtor's interest in the collateral as a property right or a specific legal interest. Article 9 also does not speak in terms of who has title to collateral among competing parties. *Id.;* Okla.Stat.Ann. tit. 12A, § 9–101 (West 1963) (Official Comment). Rather, Article 9 "focuses on the rights and duties of the secured party, the debtor, and third parties." Okla. Stat.Ann. tit. 12A, § 9–101 (West 1963) (Official Comment); *see also Trigg,* 465 F.2d at 1268. Article 9 grants rights in the collateral to creditors in the event a secured party fails to perfect his interest, Okla.Stat.Ann. tit. 12A, § 9–301 (West Supp.1993), regardless of the location of title and regardless of the debtor's or secured party's legal interest in the collateral. *Id.; see also Trigg,* 465 F.2d at 1268. This Article 9 scheme applies with equal force to the sale of accounts. Article 9 treats the interest acquired by a buyer of accounts as a security interest and treats the buyer as a secured party. *See supra.* Accordingly, the seller or assignor of the account "does not part with all transferable rights in [the] account[ ] even following an absolute assignment." Coenen, *supra,* at 1079.

■ In *Trigg,* 465 F.2d 1264, the Eighth Circuit addressed a transfer of ownership argument as it applied to a tax lien. In that case, an account assignee argued that the assignment of accounts was a transfer of property rights in the accounts leaving no property rights[7] in the debtor which the United States could attach via a tax lien. *Id.* The court rejected the assignee's argument based on the applicability of Article 9 to the assignment of accounts. *Id.* Without defining what property rights the debtor retained after assigning the accounts, the court concluded that the assignment, "did not place the progress payments beyond the reach of the federal tax lien." *Id.* at 1269; *accord Southern Rock, Inc. v. B & B Auto Supply,* 711 F.2d 683, 685 (5th Cir.1983); *see also Nevada Rock & Sand Co. v. United States Dept. of Treasury,* 376 F.Supp. 161, 170–72 (D.Nev.1974). Although the Bankruptcy Code defines property of a bankrupt's estate in terms of "legal or equitable interests of the debtor in property," 11 U.S.C. § 541(a)(1), rather than in terms of "property rights," we find *Trigg* and its progeny instructive and hold that because the transfer of ownership argument fails as to whether the debtor retains "property rights" that can be attached by a tax lien in accounts he has sold, the same argument must also fail in terms of whether the debtor retains "legal or equitable interest" in the accounts sold for purposes of the Bankruptcy Code.

In the context of bankruptcy cases, courts have dismissed arguments identical to the transfer of ownership argument Rimmer advances here. *See e.g., In Re Flowers,* 78 B.R. 774 (Bankr.D.S.C.1986); *In Re Cawthorn,* 33 B.R. 119 (M.D.Tenn.1983); *In Re Cripps,* 31 B.R. 541. In *In Re Cripps,* which involved the application of Article 9 under Oklahoma law, the petitioner, a buyer of accounts, argued that because the true na-

---

7. Under the Tax Code, a United States tax lien attaches to a debtor's "property" or "property rights." 26 U.S.C. § 6321.

ture of the transaction between herself and the debtor was a sale, she gained title to the accounts following the sale, and the accounts were her property, not property of the debtor's bankruptcy estate. *Id.* at 544. The court dismissed the petitioner's argument, stating that "[t]itle, for purposes of defining rights of parties, is of little relative consequence under [Article 9]." *Id.* (citing *Morton Booth Co. v. Tiara Furniture, Inc,* 564 P.2d 210 (Okla.1977)). The court went on to conclude that because Article 9 applies to sales of accounts as well as assignments of accounts for security, the account was property of the debtor's estate regardless of the nature of the underlying transaction. *Id.* We find the *In Re Cripps* court's reasoning to be sound.[8]

Finally, acceptance of Rimmer's transfer of ownership or title argument would allow an account buyer to benefit unfairly, at the expense of the bankrupt debtor's other creditors, from the debtor's filing for bankruptcy. For example, it is beyond dispute that, outside the realm of bankruptcy, a lien creditor would have rights in the accounts superior to the rights of the unperfected buyer of the accounts. *See* Okla. Stat.Ann. tit. 12A, § 9–301 & § 9–312 (West Supp.1993). However, under Rimmer's theory, once the debtor declares bankruptcy, *the fact of bankruptcy alone* places the accounts sold to the unperfected account buyer beyond the reach of the bankruptcy trustee and all of the bankrupt's creditors. This result is contrary to the similar aims of Article 9 and the Bankruptcy Code. The current Bankruptcy Code was designed, in part, to make bankruptcy law more congruent with the U.C.C. *In Re Antweil,* 931 F.2d 689, 693 (10th Cir. 1991), *aff'd sub nom. Barnhill v. Johnson,* —— U.S. ——, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992). The policy behind Article 9 is to ensure certainty for creditors and provide notice of security interests to third parties. *See* Okla.Stat.Ann. tit. 12A, § 9–101 (West 1963) (Official Comment). Likewise, certain provisions of the Bankruptcy Code "are designed to protect creditors by eliminating secret liens." *In Re Reliance,* 966 F.2d at 1344 (citing 11 U.S.C. §§ 544, 546). In keeping with these policies, we hold that because, under Article 9, a sale of accounts is treated as if it creates a security interest in the accounts, accounts sold by a debtor prior to filing for bankruptcy remain property of the debtor's bankruptcy estate.[9]

Accordingly, we hold that the bankruptcy court erred in concluding that Article 9 was inapplicable to Rimmer's interest. The bankruptcy court must therefore readdress, in light of Article 9, the central issue of whether the reorganization plan effectuated a transfer of Rimmer's interest to Octagon, or whether Rimmer's interest survives the Plan. The court must make findings regarding

---

**8.** Although we accept the reasoning behind *In Re Trigg* and *In Re Cripps,* we believe we must also address the Ninth Circuit case, *In Re Contractors Equipment Supply Co.,* 861 F.2d 241 (9th Cir. 1988). In *In Re Contractors,* the court implied that whether a bankruptcy estate retains a property interest in an account receivable depends on whether the underlying transaction was a sale or a security interest. *Id.* at 245. We do not adopt the court's reasoning for two reasons. First, the court relies, in part, on Article 2 of the U.C.C. which provides that a sale entails passage of title, *id.* (citing Arizona's version of U.C.C. § 2–106), and we find that Article 9, not Article 2, controls in this context. As explained above, the concept of title has no significance under Article 9 of the U.C.C., *see* Okla.Stat.Ann. tit. 12A, § 9–101 (West 1963) (Official Comment) ("Rights, obligations and remedies under the Article do not depend on the location of title."), and furthermore, Article 2 applies to sales of goods, not to sales of accounts. Okla.Stat.Ann. tit. 12A, § 2–102 (West 1963). Second, the court's reasoning that a distinction must be made between a sale of accounts and an

assignment of accounts for security was not necessary to its holding, because the court ultimately concluded that the underlying transaction was one for security and therefore Article 9 applied. *In Re Contractors,* 861 F.2d at 245. We could find no cases that relied on *In Re Contractors* to defeat a bankruptcy trustee's claim to a debtor's accounts based on the theory that an earlier sale of the accounts had deprived the bankrupt of any interest in the account.

**9.** Of course, this is not to say that an account buyer with a perfected security interest in an account forfeits his interest upon the debtor's filing for bankruptcy. Although property subject to a security interest is property of the debtor's bankruptcy estate, secured creditors of the debtor are provided "adequate protection" for their interest. *See* 11 U.S.C. § 363(e) (providing that upon a secured creditor's request, bankruptcy court must place limits, as necessary to protect creditor, on trustee's power to sell, use, or lease property of the estate).

whether Rimmer's account was a perfected security interest—i.e., whether U.C.C. filings were required or made.[10] The court must also determine the effect, if any, of the trustee's actions concerning Rimmer's account, and the effect, if any, of Rimmer's actions. For these reasons, we REVERSE the entry of summary judgment in favor of Rimmer and REMAND to the district court with instructions to vacate its judgment and remand the case to the bankruptcy court for further proceedings consistent with this opinion.

SETH, Circuit Judge, dissenting:

I must respectfully dissent from the majority opinion as I agree with the determinations made by the United States District Court for the Western District of Oklahoma and by the United States Bankruptcy Judge. Briefly, these were that the "interest" in issue was never part of the Poll, Inc. bankruptcy estate. The "interest" owned by Mr. Rimmer was in the proceeds of the sale of natural gas collected from producing wells and sold to distributors, especially to Oklahoma Natural Gas Company. It apparently was secured from Amcole.

The Bankruptcy Court, in substance, held that Appellee Rimmer owns a separate and distinct interest in 5% of the proceeds of gas and liquids sold through the Poll Gas System, and that this interest was not in Poll's bankruptcy estate nor impacted by the Trustee's conveyance of the system.

The "interest" of Rimmer which I consider is only that portion derived from what is referred to as the 1976 Agreement or the Agreement, which is herein described. By the Agreement undivided interests were sold by Amcole outright to "Sellers" who were Rimmer's predecessors.

The Agreement was an outright sales agreement signed by all the stockholders and directors who thereby sold all their stock in Poll, Inc. (and two gas wells) to Amcole as Buyer. Amcole was also a stockholder in Poll. As consideration for the purchase of the stock in Poll, Inc., Amcole agreed to pay the purchase price in full, and did so. This purchase price, as stated in the Agreement (including some cash also from Poll, Inc.), was:

> "an Override of the gross proceeds received by BUYER through Poll Gas Inc. from Oklahoma Natural Gas Company under their existing contract and any and all amendments thereto, and all other gas, and liquids purchased and sold, and all additional connections, gas processing and gathering facilities and systems, through the Poll Gas System ... [in three named counties in Oklahoma]."

The "override" was to total 9% of the proceeds of gas sales and 5% of proceeds from sales of liquids. The Agreement said these were "to be owned" as therein divided among the three named individuals and two corporations. These were the former Poll, Inc. stockholders except for Amcole.

The Agreement was to apply to any purchases of gas or liquids as well by the Oklahoma Natural Gas Company. The Agreement was filed in the county records. Appellee Rimmer was not one of these original sellers of stock, as mentioned, but bought interests from them.

The rest of Rimmer's interest originated in later agreements with other parties. The interests there concerned were also called overriding royalties.

We are concerned with Poll, Inc. as the Debtor, and its bankruptcy estate, not with Amcole. There remained nothing relating to the interests to go into the Poll bankruptcy estate. The ownership had passed by the 1976 Agreement to Amcole, and it as consideration agreed to and did create the "interests," as above described, out of what it bought—Poll Gas, Inc. I agree with the majority that enforceable interests were created by the 1976 Agreement including that owned by Rimmer, but I must disagree that they were part of the Poll bankruptcy estate.

---

10. The dissent implies that the application of Article 9 to the facts of this case automatically divests Rimmer of his interest. We do not agree that such a result is mandated. For example, upon remand, the court may determine that Rimmer retains his interest because no U.C.C. filing was required under Okla.Stat.Ann. tit. 12A, § 9–302(e) (West Supp.1993) (no filing required if account assignment does not transfer a significant part of outstanding accounts of assignor).

## I.

There is a significant aspect of the appeal which relates to the decision of the District Court, and of the Bankruptcy Court, that the "interests" of Rimmer were not part of the Debtor Poll, Inc. bankruptcy estate.

The relationship of the parties and the early transactions, particularly the changes brought about by the 1976 Agreement, must be examined. The Agreement is the source of the particular interests here considered. Before the 1976 Agreement the Poll corporation gathered gas in the field, transported it, and sold much of it to Oklahoma Natural Gas Company under contracts. Amcole decided to acquire Poll, Inc. by the 1976 Agreement. Under the Agreement *all stock* of Poll which Amcole did not already own vested in Amcole as "Buyer." All stockholders and directors of Poll signed the 1976 Agreement. The majority holds that Poll, Inc. was bound by the Agreement, and I agree.

The unusual part of the Agreement was that Amcole, as Buyer (of the stock), was obligated to use assets of Poll, that is, the gas sales contracts with Oklahoma Gas Company or the proceeds therefrom to pay the former Poll stockholders—the Sellers. To do this, and it was done, Amcole necessarily had to exercise ownership of these interests formerly of Poll, Inc. The actions of Amcole, and its performance as Buyer for its own benefit, demonstrated this ownership. It was the only way it could perform its obligation. "Control" of Poll could not do this. There would be no ownership of the interests in question after the 1976 Agreement remaining in Poll. Poll obtained no benefits under the Agreement and it lost assets. It undertook the duty to remit sales proceeds formerly its own. This was done in the capacity of a *cestui que* trust as would arise under an oil payment or similar interest. It had a duty to remit and nothing more. See Corbin on Contracts, § 873 at 823 and § 902 at 853.

Thus the "interests," which the majority defines as "accounts" *under the 1976 Agreement,* passed to Amcole as part of the sale of Poll, Inc. U.C.C. § 9–104(e) Supp. They could not then be part of the Poll, Inc. estate. Whether they were part of the Amcole estate the record does not reveal. This is one of the elements supporting the District Court's holding that the interests were not part of the Poll estate.

## II.

There is another reason why the Rimmer interest did not become part of the Poll estate.

The use by the original parties to the 1976 Agreement, and the continued use of the term "override" in later agreements between successors to the interests as a description of the interests created, is significant and cannot be ignored. It was obvious that the parties adopted the accepted characteristics and consequences of "overrides" as applicable and descriptive of the interests created. This was a clear and obvious description for them to apply to the "interests." It was in commonly used terms in the business. They adopted and applied the consequences and characteristics of such an interest in their agreements. This was clearly expressed, the intent was clear, and it can make no difference that the term is not applied to an interest of the type here concerned if its meaning they adopted and applied. We are not concerned with how the term may have been used by others. Certainly the 17 + years of "continued course of dealing" shows what the parties meant. *See* U.C.C. (with comments) § 1–102 and § 1–105.

It is apparent that the consequences, nature and scope of an "override" were adopted as descriptive as there were no time limits or period to restrict the perpetual term of such an interest and there was also *no dollar limit.* With such a permanent interest and without limits of time and money, the use or misuse of the term "override" was a clear expression or description. The nature and scope were well known and accepted.

The years of "continued course of dealing" by the parties and successors adopted its meaning and this should be sufficient under the U.C.C. An "agreement" under the U.C.C. as to consequences which would otherwise flow from the provisions of the U.C.C. includes the effect of a course of dealing (§ 1–102, § 1–105).

The intent of the parties must be applied. There is no indication whatever that the Agreement or the interests were in any way intended to be a security agreement. The course of dealing was the equivalent to an "agreement" of the parties as described in the U.C.C., which modifies the U.C.C. terms, and determines the real nature of the interests.

### III.

The position taken by the majority is that the interest of Mr. Rimmer was put in the Poll bankruptcy estate by Article 9 of the U.C.C. This position is based only on the theory that the interest fell within the Article 9 definition of an "account," and if it was an "account" it automatically was included in the Debtor's estate. This was, according to the majority, to follow regardless of the intention of the parties to the Agreement and the years of "course of dealing." When the definition was applied it was automatically something none of the parties intended, nor what it actually was as demonstrated over the 17 years. The record shows there was no debt, the interest was paid for in full, the intent was perpetual, and the interest had no dollar limit. There was no hint of commercial financing.

To apply the "account" definition is to reverse the completed 1976 sale and revest the interest in Poll. Rimmer apparently paid several hundred thousand dollars to buy the interest and the application of Article 9 would divest him of the interest. By all indications in the majority opinion he would become at most an unsecured creditor in the estate of the corporation which probably was never the source of interest to permit the application of Article 9.

The consequences of the application of Article 9 demonstrates that it is not applicable. The U.C.C. by fiat cannot change the consequences and legal nature of a transaction contrary to the intent of the parties.

The most that the statute could do, in Article 9, and this may be what it does, is to require the consequences therein provided, that is, to require this to be a security transaction, *unless a contrary intention and purpose of the parties can be shown.*

I would affirm the trial court.