The TEXAS DEVELOPMENT COMPANY, as Leasing Agent for LPS 529 # 35, Ltd., Appellant,

v.

EXXON MOBIL CORPORATION, Appellee.

No. 11–02–00045–CV.

Court of Appeals of Texas, Eastland.

Sept. 11, 2003.

John Torigian, Daniel McKay, Raymond Krell, Krell & Torigian, Houston, for appellant.

Andrew Gilchrist, M. Beth Beale, Gregory Kenney, Houston, for appellee.

Panel consists of: ARNOT, C.J., and WRIGHT, J., and McCALL, J.

### Opinion

W.G. ARNOT, III, Chief Justice.

The trial court entered summary judgment and rendered judgment that The Texas Development Company, as Leasing Agent for LPS 529 # 35, Ltd. (Texas Development), take nothing against Exxon Mobil Corporation (Exxon). We reverse and remand.

### Background

Exxon and IRC Structures and Systems (IRC) entered into Continuing Services Agreement C35706, effective January 15, 1998 (the agreement). Per the agreement, IRC performed services for Exxon on Exxon's Heritage Platform drilling rig. On July 1, 1998, IRC sent an invoice to Exxon in the amount of $117,775.00 for services performed. On September 18,

1998, IRC assigned its right to receive payment of this invoice to Texas Development. The assignment covered IRC's "right title and interest in and to that certain [July 1, 1998] invoice from [IRC] to [Exxon], being Invoice No. 00950940 in the amount of $117,775.00."

Reuel Lataquin was the Chief Executive Officer of IRC and the President of R.L. International, Inc. In July 1998, R.L. International, Inc. owed Texas Development the amount of $38,849.78 in past-due monthly rent under the terms of a lease agreement. IRC assigned the Exxon account receivable to Texas Development to satisfy R.L. International, Inc.'s obligations under the lease. In exchange for the assignment, Texas Development agreed not to evict R.L. International, Inc. from the leased premises.

After receiving notice of the assignment, Exxon paid the account to IRC at the request of Lataquin. Texas Development demanded that Exxon pay it pursuant to the assignment, but Exxon refused. Texas Development brought this action against Exxon seeking to recover on the assignment. Texas Development also asserted claims against Lataquin, both individually and d/b/a R.L. International, Inc. and d/b/a IRC Structures & Systems, for breach of the lease agreement. Exxon filed a motion for summary judgment, asserting that the assignment was void due to an anti-assignment clause in the agreement and that the election-of-remedies doctrine barred Texas Development's claims against it. Texas Development filed a motion for partial summary judgment, asserting that the assignment was binding on Exxon. The trial court granted Exxon's motion and denied Texas Development's motion in separate orders. The trial court severed Texas Development's claims against Lataquin, both individually and d/b/a R.L. International, Inc. and d/b/a

IRC Structures and Systems, from this cause. Exxon nonsuited its claims against Texas Development and IRC. Thus, the summary judgment orders became final and appealable.

### Issues Presented

In two points of error, Texas Development complains that the trial court erred in granting Exxon's motion for summary judgment and in denying its motion for partial summary judgment.

### Standard of Review

Exxon and Texas Development filed traditional motions for summary judgment. We will apply the well-recognized standard of review for traditional summary judgments. We must consider the summary judgment evidence in the light most favorable to the non-movant, indulging all reasonable inferences in favor of the non-movant, and determine whether the movant proved that there were no genuine issues of material fact and that it was entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Company, Inc.*, 690 S.W.2d 546 (Tex.1985); *City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671 (Tex.1979).

### Texas Development's Objections to Summary Judgment Evidence

■ Texas Development complains that the trial court denied its due course of law and due process rights by entering a blanket order overruling all of its (1) special exceptions to Exxon's motion for summary judgment and (2) objections to Exxon's summary judgment evidence instead of reviewing and ruling on each of the special exceptions and objections. We disagree. By entering the order, the trial court ruled on each of Texas Development's exceptions and objections. We will now address Tex-

as Development's objections to the extent necessary for the disposition of this appeal.

◼ Texas Development objected to the admissibility of the agreement. Exxon relied on the affidavit of Roy Masonheimer in support of its motion, and a copy of the agreement was attached to the Masonheimer Affidavit as Exhibit "1." In his affidavit, Masonheimer stated that he had personal knowledge of the facts stated in the affidavit; that in 1998 he was a division staff engineer for Exxon; that he was a project engineer on the Heritage Platform drilling rig upgrades; that on April 4, 1998, Exxon and IRC entered into the agreement to perform engineering services on the Heritage Platform drilling rig; and that Exhibit "1" to the affidavit was a true and correct copy of the principal document of the agreement.

These facts demonstrated that Masonheimer was competent to testify about the agreement. Masonheimer stated that Exhibit "1" to the affidavit was a true and correct copy of the principal document of the agreement. His affidavit was properly sworn before a notary. Therefore, the trial court correctly considered the agreement as summary judgment evidence. *See Republic National Leasing Corporation v. Schindler,* 717 S.W.2d 606, 607 (Tex.1986).

◼ Additionally, after Texas Development filed its objections to Exxon's evidence, Exxon requested and obtained leave of court to supplement the summary judgment record with the affidavit of Jeff Marsh. Exxon offered the Marsh affidavit in an attempt to establish that the agreement satisfied the business records exception to the hearsay rule. Texas Development did not object to the Marsh affidavit and, therefore, waived any complaint that the agreement was not proper summary judgment evidence.

*Validity of the Anti–Assignment Clause in the Agreement*

Exhibit "A" to the agreement defined the scope of IRC's services under the agreement. IRC agreed "to provide the Services specifically set out in Exhibit A when and as provided in a Work Order." Article 4.2 of the agreement provided that each work order would be deemed to incorporate the terms of the agreement. Article 17 of the agreement provided that:

> [IRC] shall not assign this Agreement in whole or in part without the prior written approval of Exxon which may be withheld for any reason. [IRC] shall not assign any Work Order incorporating this Agreement in whole or in part (including any sum accruing to [IRC]) without the prior written approval of User, which may be withheld for any reason. Any assignment of this Agreement, or any Work Order, if approved by Exxon or the applicable User, respectively, shall not relieve [IRC] of its responsibilities under this Agreement or that Work Order.

"User" is defined in the agreement as "[Exxon] or any Affiliate and their respective divisions that issue a Work Order to [IRC] as provided in this Agreement."

Texas Development asserts that the assignment was binding on Exxon because: (1) Exxon did not include language in Article 17 that "[a]ny assignment made in violation of this provision is void and unenforceable"; (2) Exxon did not include language in Article 17 prohibiting "the transfer of any rights," such as the right to receive payment for services performed; (3) Exxon's anti-assignment clause was ineffective under TEX. BUS. & COM. CODE ANN. § 2.210(b) (Vernon Supp.2003); and (4) Exxon's anti-assign-

ment clause was ineffective under former TEX. BUS. & COM. CODE § 9.318(d) (Vernon 1991).[1]

█ In Texas, anti-assignment clauses are enforceable unless rendered ineffective by an applicable statute. *Reef v. Mills Novelty Co.,* 126 Tex. 380, 89 S.W.2d 210, 211 (1936). In *Reef,* an employee assigned his right to payment under an employment contract. His employer refused to accept the assignment. The employment contract provided that:

> No assignment of your account, or any portion of it, at any time, to be binding upon this company unless such assignment is accepted and acknowledged by the company's treasurer.

The Commission of Appeals held that the assignment was not binding on the employer. The court explained:

> The precise question we are called on to decide is whether or not the parties to a contract may, by agreement, render unassignable a money claim arising under the contract. Of course the parties cannot, by such an agreement, remove the debt beyond the reach of our garnishment statutes or any other applicable statute; but no reason occurs for denying to the parties the right, so long as no statute is infringed, to bind themselves to each other as they see fit, with respect to obligations imposed by the contract. In such a case a money claim growing out of the contract, which comes to the hands of a third person, remains subject to the terms of the contract. When the debtor has the contract right to ignore a voluntary transfer of the claim, as in the instant case, no effective transfer can be made without

his consent. His contract right must be respected by third persons.

*Reef v. Mills Novelty Co.,* supra at 211.

In *Island Recreational Development Corporation v. Republic of Texas Savings Association,* 710 S.W.2d 551, 553 (Tex. 1986), an anti-assignment clause in a letter of commitment provided that ·"[t]his commitment is nontransferable or assignable to any other individual, corporation or entity unless specifically approved in writing by [lender]." The supreme court stated: "[B]y the terms of the paragraph in question the letter of commitment was not assignable without [lender's] consent." *Island Recreational Development Corporation v. Republic of Texas Savings Association,* supra at 556.

In *Texas Farmers Insurance Company v. Gerdes,* 880 S.W.2d 215 (Tex.App.-Fort Worth 1994, writ den'd), an accident victim assigned her rights to recover as a third-party beneficiary under a liability insurance policy to her chiropractor. An anti-assignment clause in the insurance policy provided that "[y]our rights and duties under this policy may not be assigned without our written consent." *Texas Farmers Insurance Company v. Gerdes,* supra at 218. The court held that the anti-assignment clause was valid and precluded the third-party beneficiary from assigning her rights without the insurance company's consent. *Texas Farmers Insurance Company v. Gerdes,* supra at 218. The court explained:

> [Anti]-assignment clauses have been consistently enforced by Texas courts, *Island Recreational Dev. Corp. v. Republic of Texas Savings Ass'n,* 710 S.W.2d 551, 556 (Tex.1986) (opinion on reh'g) (letter of commitment); *Cloughly v. NBC Bank–Seguin, N.A.,* 773 S.W.2d 652, 655 (Tex.App.-San Antonio 1989,

---

*1. The legislature amended Chapter 9, effective July 1, 2001. Former Section 9.318 is* now found in TEX. BUS. & COM. CODE ANN. § 9.408 (Vernon 2002).

writ denied), and by the Fifth Circuit applying Texas law. *Conoco, Inc. v. Republic Ins. Co.*, 819 F.2d 120, 123 (5th Cir.1987).

*Texas Farmers Insurance Company v. Gerdes,* supra at 218.

Texas Development relies on *Reuben H. Donnelley Corporation v. McKinnon,* 688 S.W.2d 612 (Tex.App.-Corpus Christi 1985, writ ref'd n.r.e.). Albert A. Connell and Reuben H. Donnelley entered into an advertising agreement. An anti-assignment provision in the agreement provided that the agreement "shall not be assigned without the prior written consent of [Donnelley]." Connell assigned the agreement to Thomas R. McKinnon without Donnelley's consent. The court relied on RESTATEMENT OF CONTRACTS § 322(2) (2d ed. 1981) in holding that the anti-assignment clause did not render the assignment ineffective. Section 322(2) provides in part:

> A contract term prohibiting assignment of rights under the contract, unless a different intention is manifested,
>
> (b) gives the obligor a right to damages for breach of the terms forbidding assignment but does not render the assignment ineffective.

The *Donnelley* court concluded that "the contract term only forbids assignment; it does not render an assignment ineffective." *Reuben H. Donnelley Corporation v. McKinnon,* supra at 615. Relying on *Donnelley,* Texas Development asserts that, while Exxon's anti-assignment clause forbade assignment, the clause did not render IRC's assignment ineffective because it lacked language that any assignment made in violation of this provision is void and unenforceable. However, we are bound by *Reef* and *Island Recreational Development Corporation.* The anti-assignment clauses in *Reef* and *Island Recreational Development Corporation* did not contain (1) language that any assignments

made in violation of this provision were void or (2) language prohibiting the transfer of any rights. Yet, the Commission of Appeals and the Texas Supreme Court determined that the anti-assignment clauses were enforceable. Likewise, Exxon's anti-assignment clause was enforceable unless it infringed on an applicable statute. *Reef v. Mills Novelty Co.,* supra at 211.

### *Applicability of Chapter 2 of the Uniform Commercial Code*

 Texas Development asserts that Section 2.210(b) of the Uniform Commercial Code (UCC) rendered Exxon's anti-assignment clause ineffective. Section 2.210(b) provides that "a right arising out of the assignor's due performance of his entire obligation can be assigned despite agreement otherwise." Section 2.210(b) is in Chapter 2 of the UCC. Chapter 2 applies to transactions involving the sale of goods. See TEX. BUS. & COM. CODE ANN. § 2.102 (Vernon 1994); *G–W–L, Inc. v. Robichaux,* 643 S.W.2d 392, 394 (Tex.1982). Chapter 2 does not apply to transactions involving the rendition of personal services. *Montgomery Ward & Company, Inc. v. Dalton,* 665 S.W.2d 507, 511 (Tex.App.-El Paso 1983, no writ). If a contract involves the sale of goods and services, Chapter 2 applies if the sale of goods is the "dominant factor" or "essence" of the transaction. *G–W–L, Inc. v. Robichaux,* supra at 394; *Westech Engineering, Inc. v. Clearwater Constructors, Inc., a Division of Phelps, Inc.,* 835 S.W.2d 190, 197 (Tex.App.-Austin 1992, no writ); *Montgomery Ward & Company, Inc. v. Dalton,* supra at 511; *Freeman v. Shannon Construction, Inc.,* 560 S.W.2d 732, 738 (Tex.Civ.App.-Amarillo 1977, writ ref'd n.r.e.).

The agreement involved the sale of goods and IRC's furnishing of engineering services in connection with the design, fa-

brication, and installation of rig modifications. The summary judgment evidence established that the "dominant factor" or "essence" of the agreement was IRC's furnishing of engineering services to Exxon. Exhibit "A" to the agreement provided that:

> This Agreement enables [IRC] to provide to Exxon, at the request of the Exxon representative, design of Heritage Platform drilling rig modifications, including fingerboard, piperack and mud tanks; fabrication and installation of fingerboard and piperack modifications; and structural assessment of the drilling unit with respect to offshore California seismic activity.

Masonheimer and Lataquin stated in their affidavits that the primary purpose of the agreement was IRC's providing of engineering services to Exxon. In the $117,775.00 invoice in question, IRC billed Exxon for 455 hours of engineering services, fabrication of racking board, and fabrication of derrick tarp supports. The rig modifications required engineering expertise, and Exxon hired IRC to provide that expertise.

*G–W–L, Inc. v. Robichaux,* supra, involved a contract for the construction and sale of a house. In holding that Chapter 2 of the UCC did not apply to the transaction, the supreme court explained:

> Additionally, building contracts involve the sale of both services and materials. In such hybrid transactions, the question becomes whether the dominant factor or "essence" of the transaction is the sale of the materials or the services. The contract in this case provided that Goldstar would "build, construct, and complete . . . and furnish and provide all labor and material to be used in the construction and erection thereof." Clearly, the "essence" or "dominant" factor of the transaction was the furnishing of labor and the performance of work required for constructing the house. (Citation omitted)

*G–W–L, Inc. v. Robichaux,* supra at 394. Similarly, in this case, the "essence" or "dominant factor" of the transaction was IRC's furnishing of engineering services in connection with the design, fabrication, and installation of the rig modifications. Chapter 2 of the UCC does not apply to the agreement.

### Applicability of Chapter 9 of the Uniform Commercial Code

▆▆▆ Texas Development asserts that Exxon's anti-assignment clause was ineffective under former Section 9.318(d) of Chapter 9 of the UCC. Former Section 9.318(d) was in effect at the time of IRC's assignment to Texas Development. Former Section 9.318(d) provided that:

> A term in any contract between an account debtor and an assignor is ineffective if it prohibits assignment of an account . . . for money due or to become due or requires the account debtor's consent to such assignment or security interest.

Chapter 9 of the UCC governs secured transactions. Section 9.104 defined the scope of coverage of Chapter 9 at the time of IRC's assignment. Former TEX. BUS. & COM. CODE § 9.104 (Vernon 1991); now TEX. BUS. & COM. CODE ANN. § 9.109 (Vernon 2002). Section 9.104(6) expressly excepted a number of transactions from coverage under Chapter 9, including "a transfer of a single account to an assignee in whole or partial satisfaction of a preexisting indebtedness." Exxon asserts that IRC's assignment of the Exxon account fell within this exception.

▆▆▆ Texas Development argues that the assignment did not fall within the "preexisting indebtedness" exception to

Chapter 9 because IRC made the assignment not only to satisfy its preexisting indebtedness (past-due rental obligations), but also to secure its future obligations (future monthly rentals) under the lease. When a lessee is obligated to pay rent in the future, the debt does not arise until the time for payment arises. *American Lease Plan v. Ben–Kro Corporation*, 508 S.W.2d 937, 942 (Tex.Civ.App.-Houston [1st Dist.] 1974, writ ref'd n.r.e.); *see also Gentry v. Bodan*, 347 F.Supp. 367, 374 (W.D.La. 1972). Therefore, IRC's future rental obligations under the lease did not constitute "preexisting indebtedness." Accordingly, if IRC made the assignment, in part, to secure its future performance under the lease, the assignment did not fall within the "preexisting indebtedness" exception to Chapter 9. *See Board of Trustees of Vacation Trust Carpenters Local No. 1780 v. Durable Developers, Inc.*, 102 Nev. 401, 724 P.2d 736, 745 (1986) ("There is no statutory authority for splitting the assignment and finding a portion of the transfer exempt from Article Nine and a portion of the same assignment subject to the provisions of Article Nine").

Neither party presented summary judgment evidence establishing the amount of past-due rent that IRC owed Texas Development on the date of the assignment. Exxon did not establish that IRC assigned the account to Texas Development only to satisfy preexisting indebtedness. Texas Development filed the affidavit of James E. Petersen, Sr. in support of its response to Exxon's motion for summary judgment. In his affidavit, Petersen stated that IRC made the assignment to satisfy its past-due rental obligations *and* to secure its future performance under the lease. He further stated that IRC also assigned an Oceaneering Intervention Engineering, Inc. account receivable to Texas Development and that the assignments of the Exxon and Oceaneering Intervention accounts represented far more money than IRC owed Texas Development. We find that Petersen's affidavit raised fact issues on Exxon's claim that the assignment fell within the "preexisting indebtedness" exception in Section 9.104(6).

■■■ Section 9.104(6) also provided that Chapter 9 did not apply to "an assignment of accounts ... for the purpose of collection only." Exxon asserts that IRC's assignment fell within this exception to Chapter 9. This exception generally applies when accounts are assigned to a collection agency for collection. *See Tradex, Inc. v. Modern Merchandising, Inc.*, 386 N.W.2d 800, 802 (Minn.Ct.App.1986); *Daly v. Shrimplin*, 610 P.2d 397, 401 (Wyo. 1980). IRC did not assign the Exxon account for the purpose of collection only; IRC assigned the account to Texas Development, at least in part, because it owed Texas Development past-due rents. Therefore, the assignment did not fall within the "assignment ... for the purpose of collection only" exception.

### Texas Development's Affirmative Defenses

■■■ Texas Development asserts that the summary judgment evidence raised fact issues on its affirmative defenses. Texas Development alleged six affirmative defenses, including waiver, in response to Exxon's claim that IRC's assignment to Texas Development was void as a result of the anti-assignment clause in the IRC–Exxon agreement. A party relying on an affirmative defense to defeat summary judgment must come forward with summary judgment evidence establishing a fact issue on each element of the affirmative defense. *American Petrofina, Inc. v. Allen*, 887 S.W.2d 829, 830 (Tex. 1994); *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex.1984).

Texas Development relied on Petersen's affidavit to support its defenses. Exxon did not raise any objections to the affidavit. In his affidavit, Petersen stated, in part: (1) that Texas Development, as lessor, and IRC, as lessee, entered into a lease agreement; (2) that IRC failed to pay monthly rentals when due under the lease agreement; (3) that Texas Development instituted eviction proceedings against IRC; (4) that the court issued a writ of possession to the constable to evict IRC from the leased premises; (5) that Lataquin requested Petersen to stop the eviction process in return for IRC's assignment of an Exxon account receivable in the amount of $117,775.00 and assignment of an Oceaneering Intervention account receivable in the amount of $28,723.00; (6) that the assignments were to be used as security to guarantee IRC's performance under the lease; (7) that the assignments represented far more money than IRC owed Texas Development; (8) that Exxon and Oceaneering Intervention confirmed the receivables would be paid when IRC completed the work; (9) that IRC assigned the accounts to Texas Development; (10) that Petersen stopped the eviction process based on Exxon's and Oceaneering Intervention's confirmations that the receivables would be paid when IRC completed the work; (11) that, by letter dated September 25, 1998, and received by Exxon on September 28, 1998, Texas Development provided Exxon with notice of the assignment; (12) that the September 25, 1998, letter requested Exxon to notify Texas Development if Exxon would not comply with the assignment; (13) that Exxon did not inform Texas Development that the invoice was not assignable; (14) that, if Exxon had informed Texas Development that it would not honor the assignment, then Texas Development would have continued with the eviction process or would have demanded that IRC furnish at least $117,775.00 of other receivables or assets; (15) that on February 2, 1999, Texas Development demanded Exxon to pay it under the assignment; (16) that on February 3, 1999, Exxon informed Texas Development that, after receiving notice of the assignment, it had mistakenly paid the account to IRC at the request of Lataquin; (17) that Exxon did not take the position that the assignment was void until it filed its motion for summary judgment in this cause; and (18) that, by failing to notify Texas Development that it would not honor the assignment, Exxon is estopped to deny the validity of the assignment and Exxon waived the non-assignability clause in the IRC–Exxon agreement.

▮▮▮▮ Waiver occurs when a party either intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming that right. *In re Epic Holdings, Inc.*, 985 S.W.2d 41, 57 (Tex.1998); *Sun Exploration and Production Company v. Benton*, 728 S.W.2d 35, 37 (Tex.1987). A party's express renunciation of a known right can establish waiver. *Tenneco Inc. v. Enterprise Products, Company*, 925 S.W.2d 640, 643 (Tex.1996) (citing *Alford, Meroney & Company v. Rowe*, 619 S.W.2d 210, 213 (Tex.Civ.App.-Amarillo 1981, writ ref'd n.r.e.)). Or, a party's silence or inaction, for so long a period that it shows an intention to yield the known right, is also enough to prove waiver. *Tenneco Inc. v. Enterprise Products Company*, supra (citing *Alford, Meroney & Company v. Rowe*, supra). Waiver is ordinarily a question of fact. *Tenneco Inc. v. Enterprise Products Company*, supra.

The well-established standards for reviewing a summary judgment require that we take Petersen's affidavit as true, indulge every reasonable inference in favor of Texas Development, and resolve any doubts in its favor. *Nixon v. Mr. Property Management Company, Inc.*, supra at

548–49. Applying these standards, we find that Petersen's affidavit raised fact issues on all of the elements of its defense that Exxon waived the non-assignability clause in the IRC–Exxon agreement. Thus, Texas Development defeated Exxon's motion for summary judgment by its assertion and proof of fact issues on an affirmative defense.[2]

## Exxon's Election–of–Remedies Defense

 In its motion for summary judgment, Exxon asserted that the election-of-remedies doctrine barred Texas Development's claims against it. Exxon contends that the election doctrine bars Texas Development from recovering against it because Texas Development "elected to pursue the $117,500 [assigned amount] from IRC rather than [Exxon]."

 An election of remedies has been defined by the Texas Supreme Court as "the act of choosing between two or more inconsistent but coexistent modes of procedure and relief allowed by law on the same state of facts." *Custom Leasing, Inc. v. Texas Bank & Trust Company of Dallas,* 491 S.W.2d 869, 871 (Tex.1973). The election doctrine may constitute a bar to relief "when (1) one successfully exercises an informed choice (2) between two or more remedies, rights, or states of facts (3) which are so inconsistent as to (4) constitute manifest injustice." *Bocanegra v. Aetna Life Insurance Company,* 605 S.W.2d 848, 851 (Tex.1980) (citing *Custom Leasing, Inc. v. Texas Bank & Trust Company of Dallas,* supra).

To obtain summary judgment on its election defense, Exxon had the burden to prove conclusively all of the elements of the defense as a matter of law such that there was no genuine issue of material fact. *Cathey v. Booth,* 900 S.W.2d 339, 341 (Tex.1995). Texas Development is attempting to recover from Exxon under the assignment and from IRC for breach of two lease agreements. Exxon did not present any summary judgment evidence that Texas Development has pursued or is pursuing inconsistent remedies or that Texas Development's pursuit of the remedies constitutes manifest injustice. Exxon did not meet its summary judgment burden on its election-of-remedies defense.

## This Court's Ruling

The trial court erred in granting summary judgment to Exxon because: (1) Exxon failed to establish, as a matter of law, that Chapter 9 of the UCC did not apply to the assignment and (2) the summary judgment evidence raised fact issues on Texas Development's waiver defense. Therefore, Texas Development's first point of error is sustained. The trial court did not err in denying Texas Development's motion for partial summary judgment because the summary judgment evidence raised fact issues on Texas Development's claim that the assignment was binding on Exxon.

The judgment of the trial court is reversed, and this cause is remanded to the trial court for further proceedings in accordance with this opinion.

---

2. In its response to Exxon's motion for summary judgment, Texas Development also asserted an estoppel defense. Because we sustain Texas Development's first point of error on the basis of its waiver defense, we do not address the estoppel issue. *See Rucker v. Bank One Texas, N.A.,* 36 S.W.3d 649, 652 (Tex.App.-Waco 2000, pet'n den'd).